826 A.2d 624

MICHAEL AND DEBORAH JOYE, ON BEHALF OF THEMSELVES AND THEIR MINOR CHILD, SHAUN JOYE; PHIL AND JOAN GREINER, ON BEHALF OF THEMSELVES AND THEIR MINOR CHILD, MELISSA GREINER; MARK AND LINDA ZDEPSKI, ON BEHALF OF THEMSELVES AND THEIR MINOR CHILD, ANNA ZDEPSKI, PLAINTIFFS–APPELLANTS, v. HUNTERDON CENTRAL REGIONAL HIGH SCHOOL BOARD OF EDUCATION AND ACTING SUPERINTENDENT OF SCHOOLS, JUDITH GRAY, IN HER OFFICIAL CAPACITY, DEFENDANTS–RESPONDENTS.

Argued February 19, 2003—Decided July 9, 2003.

570

*J.C. Salyer* argued the cause for appellants (*Mr. Salyer, Edward Barocas* and *Krovatin & Associates,* attorneys; *Mr. Salyer, Mr. Barocas* and *Ravinder S. Bhalla,* on the briefs).

*Kevin P. Kovacs* argued the cause for respondents (*Purcell, Ries, Shannon, Mulcahy & O'Neill,* attorneys).

*Donna M. Kaye,* Senior Associate Counsel, submitted a letter in lieu of brief on behalf of *amicus curiae* New Jersey School Boards Association (*Cynthia J. Jahn,* General Counsel, attorney).

*Michael O. Dermody* submitted a brief on behalf of *amici curiae* Drug-Free Schools Coalition, Geraldine Silverman, Treasurer, New Jersey Federation for Drug–Free Communities, The Livingston Municipal Alliance, Dr. Eric Voth, Chairman, Institute for Global Drug Policy of the Drug-Free America Foundation, DeForest Rathbone, Chairman, National Institute of Citizen Anti-Drug Policy, Malcolm K. Beyer, Jr., Joyce Nalepka, Carolyn Burns, Mary Jo Green, Drug-Free Kids, America's Challenge, National Families in Action, Legal Foundation Against Illicit Drugs, Ginger and Larry Katz, Courage to Speak Foundation, Nancy Starr, Pennsylvania Delegate, Drug Watch International, Stephanie Haynes, Save our Society from Drugs, Kathleen A. Berry, Momstell Coalition, Philadelphia Chapter, Theresa Costello, Mother of Divine Grace Drug Awareness Program and Dawn Engel.

The opinion of the Court was delivered by

VERNIERO, J.

We are called on to evaluate the constitutionality of a high school's random drug and alcohol testing program. The program applies to all students who participate in athletic and non-athletic extracurricular activities, or who possess school parking permits. Students who test positive for drug or alcohol use are suspended temporarily from those activities or must relinquish their parking permits. They also are required to receive counseling and to seek other treatment if necessary. They are not, however, prosecuted or otherwise exposed to criminal liability. The United States Supreme Court has upheld similar programs of other states, concluding that they do not offend the United States Constitution. We hold that the program before us does not violate the New Jersey Constitution.

Specifically, the school's substance-abuse problem has been documented by survey results showing that a third of the students in the upper grades have used illegal drugs and that forty percent of students in the same grades have been intoxicated within the survey's prior twelve-month period. Those results are consistent with other data, including information regarding three deaths due to heroin overdoses in municipalities within the school district, and consistent with testimony of counselors and other school personnel. Against that record, we reject the suggestion of our dissenting colleagues that the New Jersey Constitution requires school officials to wait for the problem to worsen before addressing it in the manner sought here.

In following the course charted by our federal counterpart, we do not signal a retreat from this Court's history of affording citizens enhanced protections under our State's constitution. The New Jersey Constitution remains a critical safeguard against unreasonable, unfair, and overbearing governmental action. The program before us, however, reflects no such conduct. Instead, it is consistent with existing law recognizing that students have a diminished expectation of privacy in a public-school context. Equally important, our law further provides that school officials

are responsible for the children entrusted to their care. From that perspective, the program represents a rational attempt by those officials and by approving parents to address a documented problem of illegal drug and alcohol use affecting a sizable portion of the student population. The program is reasonable and, therefore, constitutional.

Finally, we do not share the dissent's apparent view that every public high school automatically will satisfy the special-needs test that we more fully describe below. Although some of the test's factors, such as the students' diminished expectation of privacy, are common to all schools, other factors, such as the scope of specific drug or alcohol use, might vary from school to school. We leave open the possibility that a future program will not pass constitutional muster either because the school's chosen method of specimen collection is overly intrusive in view of alternative methods, or because the underlying drug and alcohol use at the particular school simply is inadequate to justify it.

I.

We derive our summary of the essential facts largely from certifications and other information submitted to the trial court. The parties do not dispute those facts.

Hunterdon Central Regional High School (Hunterdon Central) is located in Flemington and provides secondary education to approximately 2,500 students enrolled in grades nine through twelve. Since 1987, school administrators have implemented several policies designed to deter students from using alcohol and illegal drugs, and to counsel students who are experiencing substance-abuse problems. The school provides drug-related awareness programs in individual classes and through larger student assemblies. In addition, it maintains a student assistance program (SAP) that employs three full-time professionals who counsel students and their families regarding drug and alcohol abuse.

The school occasionally conducts searches of student lockers and so-called "dog-sniffing sweeps" in concert with the county prosecu-

tor. Under a suspicion-based program in place since 1996, the school also tests individual students who are suspected of using illicit drugs or alcohol. The locker searches, dog-sniffing sweeps, and suspicion-based tests are not challenged in this appeal.

Lisa Brady is the school's principal. Brady submitted a certification in which she indicated that despite the above efforts, in 1997 administrators continued to have concerns "about the apparent presence of illegal drug and alcohol use by students." She explained that "[c]oaches, teachers and administrators reported anecdotally their concern about what they perceived to be a growing problem." The principal also reported that in 1997 she "personally became aware of two students snorting heroin on school premises." Results from the suspicion-based program appeared to corroborate the anecdotal reports. During the 1996–97 school year, the school tested thirty students for illegal drug use based on reasonable suspicion, twenty-seven (or ninety percent) of whom tested positive.

To assist it in better understanding the scope of the perceived problem, the Hunterdon Central Regional High School Board of Education (Board) retained the services of the Rocky Mountain Behavioral Science Institute, Inc. (RMBSI) of Fort Collins, Colorado. The Board commissioned the RMBSI to conduct a survey regarding "the nature and extent of illegal drug and alcohol use by Hunterdon Central students[.]" The survey consisted of a written questionnaire administered to students that took approximately thirty-five minutes to complete. On an anonymous basis, the survey questioned students about their history with drugs and alcohol, and the frequency and intensity of any current use. According to Brady, "the [s]chool was assured that the [s]urvey was scientifically reliable due to its built in controls to detect erroneous or exaggerated responses and its consistency checks."

The survey reveals that as of the 1996–97 school year, over thirty-three percent of Hunterdon Central's students between grades ten and twelve had used marijuana within the preceding twelve-month period. It also indicates that thirteen percent of

seniors had tried cocaine; twelve percent of juniors had used hallucinogens; twelve percent of sophomores had tried stimulants; and twenty-one percent of freshmen had tried inhalants. Moreover, a substantial portion of the student body perceives that illegal drugs readily are available. As for alcohol, the study indicates that over forty percent of students between grades ten and twelve had "been drunk" within the twelve-month period prior to the survey, and over eighty-five percent of all students had tried alcohol.

Responding to those results and to "continual feedback from the school staff," the Board implemented its first random drug and alcohol testing program in July 1997. The Board confined the program to students who participated in interscholastic sports. The program required parents or guardians to consent to having their children subjected to random testing as a condition of participating in the school's athletic activities. Between 1998 and 2000, over 1,000 student athletes per school year became eligible for testing. Of that number, the school randomly tested approximately 100 student athletes a year. Less than five percent of those students tested positive for drug or alcohol use. (The exact number is not in the record. Brady indicated that because the number is so low, publishing it might reveal student identities, a circumstance that the school seeks to avoid consistent with confidentiality rules.)

Shortly after that initial program took effect, the Board held a public meeting at which David Evans, an expert on teen drug use and himself a parent of a Hunterdon Central student, responded to questions raised by students and their parents. At Evans' suggestion, the Board established a task force to "evaluate [the then-current] drug testing procedure in place at Hunterdon Central and [to] present recommendations" for any needed revisions. The Board appointed Evans as the task force's chair and appointed Joan Greiner, a drug-testing opponent (and a plaintiff in this case), as its vice chair. According to Evans, the task force "was comprised of student representatives, and representatives from

parents, the booster club, the [SAP], school administration, teachers, coaches, and drug testing experts."

The task force met for a period of several months, beginning in January 1998 and concluding in November 1998. It evaluated existing substance-abuse programs at the school, including the random drug testing program for athletes, as well as information provided by SAP staff and information related to day-to-day drug and alcohol problems among students. In addition, it reviewed national and New Jersey data on student drug abuse, and received information from administrators, coaches, the school nurse, and other individuals concerning Hunterdon Central's drug situation.

Brady, then a vice principal, served as a task force member. She explained:

> [W]e heard from students and coaches who supported the [existing athletic testing] program because it was working. The clear perception was that drug use among athletes had declined significantly because of the possibility of being tested. One student explained that it eased peer pressure by giving student athletes a reason not to participate in use of alcohol and drugs. We consider the low positive rate [the previously cited five-percent figure] to indicate program success.

The task force solicited public input by sending letters to parents and holding a public meeting in October 1998. It also obtained law enforcement data, including arrest reports and drug overdoses, from the municipalities that send students to Hunterdon Central. The task force member who gathered that data reported:

> [I]n the 1996–1997 school year the police statistics from the Township of Raritan, one of Hunterdon Central's sending districts[,] reported 103 arrests for drug-related offenses. Of these 103 arrests, 41 were juveniles. There were 15 juveniles arrested for alcohol related offenses and three deaths associated with heroin overdose. For the 1997–1998 school year, the police statistics for the Raritan sending district showed 91 arrests for drug related offenses. Of these 91 arrests, 33 were juvenile.

The task force issued its final report in November 1998. Over Joan Greiner's lone objection, task force members voted to expand the school's random drug and alcohol testing program to include students who held parking permits or who engaged in non-athletic extracurricular activities.

The Board reviewed the task force's report and continued to hold public meetings to address the subject. The Board also re-commissioned the RMBSI in 1999 to conduct a follow-up survey for the 1999–2000 school year. Although the survey revealed that illegal drug use had declined, the Board concluded that student use of alcohol, marijuana, cocaine, and other drugs still was at an unacceptable level. Brady described the Board's reaction:

> The School Board commissioned RMBSI to do a follow up survey in 1999–2000. According to [the 1999–2000] survey, drug use was thankfully down in most categories. We believe it was down due, in part, to the success of random drug testing among the substantial number of students who engage in athletics. While drug use was generally down, however, use of marijuana was up slightly among seniors, use of cocaine was still at 7% for juniors, and there was still an unacceptably significant use of drugs among students in general.

Other school personnel spoke of their experiences with student drug and alcohol use, which appeared consistent with the survey results. A retired student assistance coordinator stated that during her thirteen-year tenure at Hunterdon Central she had "observed a steady increase in the number of students using drugs and a major increase in the frequency and amount of drugs."

Another coordinator, who also served as a task force member, reported that during her twenty-seven-year tenure at the school she had observed a measurable increase in student referrals to the SAP. The work load of "[c]ounselors dealing with drug and alcohol problems increased at least 33% from the [1996–97] to [1999–2000] school year[s,] requiring a third [s]tudent [a]ssistance [c]ounselor position to be established and filled." During that same period, the SAP "handled over 300 referrals per year." The coordinator also indicated that "many of the referrals are athletes and students engaged in extracurricular activities."

According to Brady, while the Board undertook its review, "illegal drug and alcohol use continued to be a problem among the student body in general." The school maintained its suspicion-based program during that period. Under that program, the school tested thirty-one students during the 1998–99 school year, twenty-eight (or ninety percent) of whom tested positive. In the 1999–2000 school year, the school tested forty-six students, thirty-

eight (or eighty-two percent) of whom tested positive. Brady also stated that "[m]ost recently in the Spring of 2000, four students who ingested illegal drugs became sick at school[.]"

The Board ultimately accepted the task force's recommendation in December 1999. Fully implemented as of September 2000, the expanded policy "authorizes the [school's] Administration to conduct random drug testing of all students engaged in extracurricular activities and all students authorized to park on school premises." It defines extracurricular activity as "[a]ny non-credit activity in which a student participates." When the Board announced its decision it listed promotion of health and safety as one of its primary objectives. It also stated that the policy sought "to deter drug use, thereby countering peer pressure which may encourage indulgence" and "to encourage students who use alcohol and drugs to participate in rehabilitative programs[.]"

The program requires both the student and his or her parent or guardian to execute a consent form. The form includes an acknowledgment that the student is eligible for testing "throughout the designated time of participation" in an athletic or non-athletic extracurricular activity or while the student holds a parking permit. By signing the form, the student also indicates:

I understand fully that my performance as a participant and the reputation of my school are dependent, in part, on my conduct as an individual. I hereby agree to accept and abide by the standards, rules and regulations set forth by the [Board] and the sponsors for the activity in which I participate.

I authorize the Hunterdon Central Regional High School District to conduct a test on a urine specimen and saliva specimen and/or breath specimen that I provide on site to test for alcohol and drug use if my name is drawn from the random pool. Pursuant to the Student Random Drug and Alcohol Policy, I also authorize the release of information concerning the results of such test to designated District personnel.

As of the trial court's opinion (January 4, 2001), students and their parents or guardians had executed 866 consent forms.

The trial court succinctly summarized the testing procedure used for students engaged in either athletic or non-athletic extracurricular activities:

Specifically, each week the Athletic Director contacts a grade level Vice Principal and oversees the drawing from a box of ID numbers on the morning of testing. Parents are called to be informed that their child has been selected to be tested and they are given the right to attend if they so [choose]. The Athletic Director then contacts the appropriate grade level Vice Principal and the student's schedule is pulled to ascertain the least disruptive time for the testing. At that time, the student is contacted by the Vice Principal and informed that he or she has been selected for a random drug test. The Vice Principal then accompanies the student to the nearest Health Office where the student is interviewed by the nurse and is required to provide a urine sample. The sample is provided in a rest room with the door closed. The sample is tested for adulteration. If the test [for illegal substances] is positive, the parents are called if they are not already there. A second test based on the sample provided is then performed by ... an outside testing laboratory. [The laboratory] conducts a gas chromatography mass spectrometry ... test which lists the exact chemical nature of the drug. The results of that test are returned to the school within 24 hours. The second test is designed to ensure against false positives.

The policy sets forth the consequences should a student test positive for drugs or alcohol. For a first infraction, the school suspends the student from participating in the sport or other extracurricular activity, and similarly suspends his or her parking privilege. Those suspensions remain in effect until the student completes a five-day preventative education program and submits a urinalysis indicating no alcohol or drug use. The school also requires the student to attend a minimum of five counseling sessions with a student assistance coordinator and to undergo further treatment if necessary.

For a second infraction, the school suspends the student from the athletic or non-athletic activity and revokes his or her parking privilege for sixty days, starting from the date of the test that indicated the second violation. The school requires the student to attend a five-day education program, to attend a minimum of ten counseling sessions with a student assistance coordinator, and to resubmit a urinalysis free of alcohol or illegal drugs as of the conclusion of the suspension period. The school also reserves the right to conduct "periodic, unannounced" tests on any student found to have committed a second infraction.

Hunterdon Central treats a student's test result as a confidential health record pursuant to regulations of the New Jersey

Department of Education. Those regulations provide that "[i]nformation obtained by the school's alcohol and other drug testing program which would identify the student as an alcohol or other drug user may be disclosed only for those purposes and under those conditions permitted by [federal regulations]." *N.J.A.C.* 6A:16–1.5(c)(2). Federal regulations, in turn, prohibit the release of such records except under highly limited circumstances (such as when a court directs their disclosure). 42 *C.F.R.* §§ 2.1, 2.2. Federal regulations also provide that no record "may be used to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient." *Id.* at §§ 2.1(c), 2.2(c). Accordingly, Hunterdon Central does not share individual test results with law enforcement authorities.

Challenging the program's constitutionality on behalf of themselves and their respective children, three sets of parents (collectively, plaintiffs) filed this suit in August 2000. Their complaint seeks to overturn the school's entire random-based policy, including its athletic and non-athletic components. Defendants are the Board and the Superintendent of Schools.

Joan Greiner, formerly the task force's vice chair, is one of the plaintiffs. She submitted a certification on behalf of herself and her husband contending that the Board's policy violated their daughter's right to privacy and "interfer[ed] with our parental rights to raise our daughter as we think best and to teach her the personal responsibility she needs as a young adult." The complaint asserts a similar contention on behalf of the other two sets of plaintiffs. Greiner also expressed a concern that if subjected to the program, her daughter would have had "to reveal medical information if she [had been] selected for random testing." More broadly, Greiner stated that "there was no evidence of the existence of drug or alcohol problems specifically among students who participate in sports, extracurricular activities, or who have parking permits."

John Brasell, Jr., the Board's president, submitted a certification defending the Board's decision. He described the develop-

ment of the program's athletic and non-athletic components, out-lining the chronology noted above. He also stated that, in his "years as a Board member," he has observed that parents "have a tendency to react openly when opposing a program or policy[.]" He further noted that "[i]n a school district representing approximately 2,500 students, 4,000 parents and over 15,000 households only 3 students and their parents are in opposition [to the program]." In Brasell's view, that fact "speak[s] very loudly in favor of the Board's policy."

The Board president also certified:

I believe this Board has taken the steps to ensure that due diligence was applied and that our policy fairly balances the privacy rights of students and the obligation we have as public officials to protect students in the care of our school. I further believe we have taken the patient, well-thought out approach to implement a policy that we believe will assist our students in combating one of the leading killers of our youth today. This program has proven to be successful with our athletes and will continue to work to deter drug use if expanded to include our students with parking permits and those engaged in extracurricular activities.

The trial court agreed with plaintiffs, invalidating the entire program. The court determined that the program violated the prohibition against unreasonable searches and seizures under Article I, paragraph 7 of the New Jersey Constitution, a provision analogous to the Fourth Amendment of the United States Constitution. With one member of the panel dissenting, the Appellate Division reversed the trial court's determination in a reported opinion written by Judge Stern. *Joye v. Hunterdon Cent. Bd. of Educ.*, 353 *N.J.Super.* 600, 803 *A.2d* 706 (2002). Plaintiffs appealed to this Court as of right. *R.* 2:2–1(a)(2). We granted *amicus curiae* status to the New Jersey School Boards Association and to numerous anti-drug organizations (the organizational *amici*), all of which join defendants in defending the school's expanded policy.

## II.

### A.

We note preliminarily that the student plaintiffs no longer attend Hunterdon Central, having completed all grades and hav-

ing graduated since the trial court's decision. The school's testing program, therefore, no longer confronts them, a circumstance that renders moot their underlying complaint. Nonetheless, we elect to resolve their constitutional challenge given its public significance and the likelihood "that controversies similar to this one will present themselves in the future." *Clymer v. Summit Bancorp.,* 171 *N.J.* 57, 66, 792 *A.*2d 396 (2002); *see also State v. Hackett,* 166 *N.J.* 66, 70, 764 *A.*2d 421 (2001) (electing to resolve criminal appeal even though defendant had passed away because case involved "important public issues in need of resolution").

## B.

■ Turning to the merits of their arguments, the parties do not dispute that Hunterdon Central's random drug and alcohol testing program plainly is constitutional under federal law. The sole issue is whether the program offends the New Jersey Constitution. Although we are not bound by federal decisions when interpreting our State's constitution, "federal decisional law may serve to guide us in our resolution of New Jersey issues[.]" *State v. Cooke,* 163 *N.J.* 657, 670, 751 *A.*2d 92 (2000). We turn, then, to two pertinent decisions of the United States Supreme Court that will provide a backdrop to our disposition.

The seminal case addressing random or suspicionless drug testing in a public school is *Vernonia School District 47J v. Acton,* 515 *U.S.* 646, 115 *S.Ct.* 2386, 132 *L.Ed.*2d 564 (1995). In that case, a school district in Oregon adopted a policy that required "all students participating in interscholastic athletics" to consent to random drug testing. *Id.* at 650, 115 *S.Ct.* at 2389, 132 *L.Ed.*2d at 572. The Supreme Court described the difficulties experienced by school administrators that prompted them to implement the policy:

"[T]he administration was at its wits end and . . . a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion. Disciplinary actions had reached 'epidemic proportions.' The coincidence of an almost three-fold increase in classroom disruptions and disciplinary reports along with the staff's direct observations of students using drugs or

584

glamorizing drug and alcohol use led the administration to the inescapable conclusion that the rebellion was being fueled by alcohol and drug abuse as well as the student's misperceptions about the drug culture."

[*Id.* at 649, 115 *S.Ct.* at 2389, 132 *L.Ed.*2d at 572 (internal citation omitted).]

In evaluating the policy under a special-needs balancing test, the Court first considered the nature of the privacy interest at stake. The Court explained that "[p]articularly with regard to medical examinations and procedures, ... 'students within the school environment have a lesser expectation of privacy than members of the population generally.' " *Id.* at 657, 115 *S.Ct.* at 2392, 132 *L.Ed.*2d at 577 (quoting *New Jersey v. T.L.O.*, 469 *U.S.* 325, 348, 105 *S.Ct.* 733, 746, 83 *L.Ed.*2d 720, 739 (1985) (Powell, J., concurring)). It further observed that student athletes have an expectation of privacy even lower than that of other students. The Court stated that "[b]y choosing to 'go out for the team,' [student athletes] voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Id.* at 657, 115 *S.Ct.* at 2393, 132 *L.Ed.*2d at 577.

The Court next considered the nature of the intrusion engendered by the policy. In the Court's view, even though the collection of urine intrudes on an " 'excretory function traditionally shielded by great privacy,' ... the degree of intrusion depends upon the manner in which production of the urine sample is monitored." *Id.* at 658, 115 *S.Ct.* at 2393, 132 *L.Ed.*2d at 577 (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 *U.S.* 602, 626, 109 *S.Ct.* 1402, 1418, 103 *L.Ed.*2d 639, 666 (1989)). The Court noted that the school collected urine samples under conditions "nearly identical to those typically encountered in public restrooms[.]" *Ibid.* Under those circumstances, the Court concluded that "the privacy interests compromised by the process" were "negligible." *Ibid.*

The Court's privacy analysis also included the scope of the urinalysis itself. In that regard, the Court found it significant that the tests sought to reveal only drug use and not "whether the student is, for example, epileptic, pregnant, or diabetic[.]" *Id.* at 658, 115 *S.Ct.* at 2393, 132 *L.Ed.*2d at 578. Moreover, the Court

emphasized that the school disclosed the test results only to a limited number of personnel on a need-to-know basis, and that it did not forward the results to law enforcement authorities for criminal prosecution. *Ibid.*

The Court then examined "the nature and immediacy of the governmental concern at issue[,]" *id.* at 660, 115 *S.Ct.* at 2394, 132 *L.Ed.*2d at 579, and expressed no doubt that deterring student drug use "is important—indeed, perhaps compelling." *Id.* at 661, 115 *S.Ct.* at 2395, 132 *L.Ed.*2d at 579. The Court also viewed the policy as being narrowly tailored to detect "drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Id.* at 662, 115 *S.Ct.* at 2395, 132 *L.Ed.*2d at 580. Along those same lines, the Court found that "the particular drugs screened by the [drug testing policy] have been demonstrated to pose substantial physical risks to athletes." *Ibid.*

Considering those three factors, "the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search," the Court held that the school district's policy was "reasonable and hence constitutional." *Id.* at 664–65, 115 *S.Ct.* at 2396, 132 *L.Ed.*2d at 582. Lastly, the Court cautioned that suspicionless drug testing might not "pass constitutional muster in other contexts." *Id.* at 665, 115 *S.Ct.* at 2396, 132 *L.Ed.*2d at 582. It emphasized that "[t]he most significant element in this case is the first we discussed: that the [drug policy] was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." *Ibid.*

The Supreme Court extended *Vernonia's* holding in *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls,* 536 *U.S.* 822, 122 *S.Ct.* 2559, 153 *L.Ed.*2d 735 (2002). The drug policy at issue in that case applied "to competitive extracurricular activities" such as the "Academic Team, Future Farmers of America, Future Homemakers of America, band, choir, pom-pom, cheerleading, and athletics." *Id.* at 826, 122 *S.Ct.*

at 2562–63, 153 *L.Ed.*2d at 742. The policy required all students to submit to an initial drug test before beginning an extracurricular activity, to submit to random drug testing during the period of participation, and to "agree to be tested at any time upon reasonable suspicion." *Id.* at 826, 122 *S.Ct.* at 2563, 153 *L.Ed.*2d at 742.

In applying essentially the same balancing test articulated in *Vernonia,* the *Earls* Court first looked to "the nature of the privacy interests allegedly compromised by the drug testing." *Earls, supra,* 536 *U.S.* at 830, 122 *S.Ct.* at 2565, 153 *L.Ed.*2d at 744. It reaffirmed that "[a]s in *Vernonia,* the context of the public school environment serves as the backdrop for the analysis of the privacy interest at stake and the reasonableness of the drug testing policy in general." *Id.* at 830, 122 *S.Ct.* at 2565, 153 *L.Ed.*2d at 744 (citation omitted). The Court noted that "[i]n upholding the drug testing program in *Vernonia,* we considered the school context '[c]entral' and '[t]he most significant element.' " *Id.* at 831 n. 3, 122 *S.Ct.* at 2565 n. 3, 153 *L.Ed.*2d at 745 n. 3 (citation omitted).

The Court next reiterated that the privacy interests of students are limited "in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Id.* at 830, 122 *S.Ct.* at 2565, 153 *L.Ed.*2d at 745. It rejected the notion that "because children participating in non-athletic extracurricular activities are not subject to regular physicals and communal undress, they have a stronger expectation of privacy than the athletes tested in *Vernonia.*" *Id.* at 831, 122 *S.Ct.* at 2565, 153 *L.Ed.*2d at 745. Instead, the Court found that like athletes, students who engage in non-athletic extracurricular activities "voluntarily subject themselves to many of the same intrusions on their privacy[.]" *Id.* at 831, 122 *S.Ct.* at 2566, 153 *L.Ed.*2d at 745. Such intrusions involve "occasional off-campus travel," "communal undress," and special "rules and requirements for participating students that do not apply to the student body as a whole." *Id.* at 832, 122 *S.Ct.* at 2566, 153 *L.Ed.*2d at 745.

As it did in *Vernonia*, the Court in *Earls* concluded that the process of collecting urine was "minimally intrusive[.]" *Id.* at 834, 122 *S.Ct.* at 2567, 153 *L.Ed.*2d at 747. The Court observed that the students' test results were kept confidential and were not forwarded to law enforcement authorities. *Id.* at 833, 122 *S.Ct.* at 2566, 153 *L.Ed.*2d at 746. It further noted that positive test results did not "lead to the imposition of discipline or have any academic consequences," except to "limit the student's privilege of participating in extracurricular activities." *Id.* at 833, 122 *S.Ct.* at 2566–67, 153 *L.Ed.*2d at 746.

Concerning the immediacy and nature of the government's interests, the Court considered "the nationwide drug epidemic," *id.* at 834, 122 *S.Ct.* at 2567, 153 *L.Ed.*2d at 747, as well as "the need to prevent and deter the substantial harm of childhood drug use[.]" *Id.* at 836, 122 *S.Ct.* at 2568, 153 *L.Ed.*2d at 748. The Court refused to require the respondent school district to demonstrate "some identifiable drug abuse problem among a sufficient number of those subject to the testing[.]" *Ibid.* The Court reasoned: "[I]t would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug testing program designed to deter drug use." *Ibid.*

The Court also rejected the argument that suspicion-based testing is less intrusive than random testing and that schools should limit their policies accordingly. The Court stated:

> [T]he Fourth Amendment does not require a finding of individualized suspicion, and we decline to impose such a requirement on schools attempting to prevent and detect drug use by students. Moreover, we question whether testing based on individualized suspicion in fact would be less intrusive. Such a regime would place an additional burden on public school teachers who are already tasked with the difficult job of maintaining order and discipline. A program of individualized suspicion might unfairly target members of unpopular groups. The fear of lawsuits resulting from such targeted searches may chill enforcement of the program, rendering it ineffective in combating drug use.
>
> [*Id.* at 837, 122 *S.Ct.* at 2568–69, 153 *L.Ed.*2d at 749 (internal citations omitted).]

Finally, the Court explained that "[w]hile in *Vernonia* there might have been a closer fit between the testing of athletes and

the ... finding that the drug problem was 'fueled by the "role model" effect of athletes' drug use,' such a finding was not essential to the holding." *Id.* at 837–38, 122 *S.Ct.* at 2569, 153 *L.Ed.*2d at 749 (citation omitted). It stated that *"Vernonia* did not require the school to test the group of students most likely to use drugs, but rather considered the constitutionality of the program in the context of the public school's custodial responsibilities." *Id.* at 838, 122 *S.Ct.* at 2569, 153 *L.Ed.*2d at 749. The Court, therefore, found that the drug testing policy was "a reasonable means of furthering the School District's important interest in preventing and deterring drug use among its schoolchildren." *Ibid.*

In a thoughtful concurring opinion, Justice Breyer emphasized the policy considerations that, in his view, favored the Court's holding:

First, the drug problem in our Nation's schools is serious in terms of size, the kinds of drugs being used, and the consequences of that use both for our children and the rest of us.

Second, the government's emphasis upon supply side interdiction apparently has not reduced teenage use in recent years.

Third, public school systems must find effective ways to deal with this problem.... The law itself recognizes these responsibilities with the phrase *in loco parentis*—a phrase that draws its legal force primarily from the needs of younger students ... and which reflects, not that a child or adolescent lacks an interest in privacy, but that a child's or adolescent's school-related privacy interest, when compared to the privacy interests of an adult, has different dimensions[.]

Fourth, the program ... seeks to discourage demand for drugs by changing the school's environment in order to combat the single most important factor leading school children to take drugs, namely, peer pressure. It offers the adolescent a non-threatening reason to decline his friend's drug-use invitations, namely, that he intends to play baseball, participate in debate, join the band, or engage in any one of half a dozen useful, interesting, and important activities.

[*Id.* at 839, 122 *S.Ct.* at 2569–70, 153 *L.Ed.*2d at 750–51 (Breyer, J., concurring) (internal citations omitted).]

Justice Breyer also noted that the school district's policy had engendered little community opposition, suggesting that that factor is relevant when evaluating whether a policy unduly infringes on a student's privacy interests. He noted other practical considerations as well:

First, not everyone would agree with this Court's characterization of the privacy-related significance of urine sampling as "negligible." Some find the procedure no more intrusive than a routine medical examination, but others are seriously embarrassed by the need to provide a urine sample with someone listening "outside the closed restroom stall[.]" When trying to resolve this kind of close question involving the interpretation of constitutional values, I believe it important that the school board provided an opportunity for the airing of these differences at public meetings designed to give the entire community "the opportunity to be able to participate" in developing the drug policy. The board used this democratic, participatory process to uncover and to resolve differences, giving weight to the fact that the process, in this instance, revealed little, if any, objection to the proposed testing program.

Second, the testing program avoids subjecting the entire school to testing. And it preserves an option for a conscientious objector. He can refuse testing while paying a price (nonparticipation) that is serious, but less severe than expulsion from the school.

Third, a contrary reading of the Constitution, as requiring "individualized suspicion" in this public school context, could well lead schools to push the boundaries of "individualized suspicion" to its outer limits, using subjective criteria that may "unfairly target members of unpopular groups," or leave those whose behavior is slightly abnormal stigmatized in the minds of others[.]

[*Id.* at 841–42, 122 *S.Ct.* at 2570–71, 153 *L.Ed.*2d at 751–52 (Breyer, J., concurring) (internal citations omitted).]

### III.

#### A.

With *Vernonia* and *Earls* as background, we turn to New Jersey law. Article I, paragraph 7 of the New Jersey Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

That provision and its Fourth Amendment analogue contain nearly identical language designed to "prohibit unreasonable searches and seizures by government agents." *N.J. Transit PBA Local 304 v. N.J. Transit Corp.*, 151 *N.J.* 531, 543, 701 *A.*2d 1243 (1997).

Generally, reasonableness under Article I, paragraph 7 requires the police to undertake a search of a person only when

authorized by a warrant issued by a neutral judicial officer. *Id.* at 543–44, 701 *A*.2d 1243. In applying for the warrant, the government must have probable cause to believe that the person to be searched has violated the law. *Ibid.* Those strictures, however, are not absolute. We will uphold a warrantless search whenever it "falls within one of the recognized exceptions to the warrant requirement." *Id.* at 544, 701 *A*.2d 1243. One such exception is that "administrative searches of highly or pervasively regulated industries have been permitted without probable cause or individualized suspicion." *Id.* at 545, 701 *A*.2d 1243 (citing *In re Martin,* 90 *N.J.* 295, 310–16, 447 *A*.2d 1290 (1982) (allowing New Jersey Division of Gaming Enforcement to conduct suspicionless searches of casino licensees)).

Our willingness to tolerate a warrantless search often turns on the overall reasonableness of the government's conduct and the degree to which a citizen "has a legitimate expectation of privacy in the invaded place." *State v. Stott,* 171 *N.J.* 343, 354, 794 *A*.2d 120 (2002) (internal quotation marks and citation omitted). We have observed that "[a] subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable[.]" *Ibid.* (internal quotation marks and citation omitted) (alterations in original). In that respect, this Court has found that "[t]here is a lesser expectation of privacy in one's automobile, and in one's office, than in one's home." *State v. Johnson,* 168 *N.J.* 608, 625, 775 *A*.2d 1273 (2001) (internal citations omitted).

 Our law also reflects that schoolchildren possess a diminished expectation of privacy and, correspondingly, that school officials must have authority "to maintain order, safety and discipline [within a school]." *State in re T.L.O.,* 94 *N.J.* 331, 342, 463 *A*.2d 934 (1983), *rev'd on other grounds, T.L.O., supra,* 469 *U.S.* 325, 105 *S.Ct.* 733, 83 *L.Ed.*2d 720. Traditionally, "the schoolmaster-student relationship was thought to be legally analogous to that of parent and child." Joanna Raby, *Reclaiming Our Public Schools: A Proposal for School-wide Drug Testing,* 21 *Cardozo L.Rev.* 999, 1000 (1999). Given their special status, "school offi-

cials were permitted a degree of latitude in enforcing behavior within the schools that other governmental bodies did not enjoy." *Ibid.*

Consistent with those principles, this Court has observed that "[i]n a limited sense the teacher stands in the parent's place in his relationship to a pupil under his care and charge, and has such a portion of the powers of the parent over the pupil as is necessary to carry out his employment." *Titus v. Lindberg,* 49 *N.J.* 66, 74, 228 *A.*2d 65 (1967) (internal quotation marks and citation omitted). We also have noted that the relationship between students and school officials is highly regulated. In that context, we have instructed:

> It must be borne in mind that the relationship between the child and the school authorities is not a voluntary one but is compelled by law. The child must attend school and is subject to school rules and disciplines. In turn the school authorities are obligated to take reasonable precautions for his safety and well-being.
>
> [*Jackson v. Hankinson and Bd. of Educ. of New Shrewsbury,* 51 *N.J.* 230, 235, 238 *A.*2d 685 (1968) (internal citations omitted).]

The foregoing does not mean, however, that school officials enjoy absolute constitutional immunity. See Raby, *supra,* 21 *Cardozo L.Rev.* at 999 (tracing evolution of law in this area). Rather, courts have held that constitutional protections extend to students within the public-school context, but not to the full extent that such protections extend to adult citizens in other settings. *Ibid.*

*T.L.O., supra,* 94 *N.J.* 331, 463 *A.*2d 934, illustrates the evolution of case law in which courts have sought to balance the rights of students against the duty of officials to maintain a safe and orderly school environment. In that case, a high school assistant principal conducted a warrantless search of a student's purse, finding rolling papers that he suspected were drug paraphernalia. *Id.* at 336, 463 *A.*2d 934. "He therefore looked further into the purse and found a metal pipe of the kind used for smoking marijuana, empty plastic bags and one plastic bag containing a tobacco-like substance." *Ibid.*

The assistant principal contacted the student's mother and the police. *Id.* at 337, 463 *A.*2d 934. The State eventually charged the student "with delinquency based on possession of marijuana with the intent to distribute." *Id.* at 336, 463 *A.*2d 934. The trial court (then called the Juvenile and Domestic Relations Court) denied the student's motion to suppress the items seized from the purse. *Ibid.* A divided panel of the Appellate Division affirmed. *Id.* at 338, 463 *A.*2d 934.

We reversed. In so doing, however, we articulated a reduced constitutional standard for evaluating searches by school officials. We stated that school officials are authorized to conduct such administrative searches, without a warrant and without probable cause, provided that they have "reasonable grounds to believe that a student possesses evidence of illegal activity or activity that would interfere with school discipline and order[.]" *Id.* at 346, 463 *A.*2d 934. Concluding that the assistant principal had not satisfied that test, we reversed the lower courts' denial of the student's suppression motion. *Id.* at 347, 463 A.2d 934.

We decided *T.L.O.* solely on Fourth Amendment grounds. *Id.* at 336, 463 *A.*2d 934. The United States Supreme Court ultimately rejected our conclusion that the assistant principal did not have a reasonable basis to conduct the search. Accordingly, it reversed our judgment. Yet, the Court echoed our observations concerning the public-school context, concluding "that the school setting required some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O., supra,* 469 *U.S.* at 340, 105 *S.Ct.* at 742, 83 *L.Ed.*2d at 733. The Court determined, as did we, that the warrant requirement "is unsuited to the school environment," *ibid.,* and that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341, 105 *S.Ct.* at 742, 83 *L.Ed.*2d at 734.

In a passage that now appears to have anticipated the drug-testing cases that would come a decade later, the Supreme Court also observed:

Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems. Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of school-children, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult.

[*Id.* at 339, 105 *S.Ct.* at 741, 83 *L.Ed.*2d at 733 (internal citation omitted).]

*T.L.O.,* therefore, established two critical principles. First, the right to be free of unreasonable searches and seizures extends to students within a public school. Second, the nature of the schoolhouse environment, with its emphasis on safety, order, and discipline, requires a relaxed application of traditional search-and-seizure rules. Like our decisional law, New Jersey statutory law similarly reflects the notion that school officials must be empowered to supervise and ensure the safety of students within reasonable limits. *See, e.g., N.J.S.A.* 18A:6–1 (prohibiting use of corporal punishment but authorizing school officials to apply rea-sonable force to quell disturbances, obtain control of weapons, protect themselves, and protect other persons or property); *N.J.S.A.* 18A:37–1 (requiring pupils to "submit to the authority of the teachers").

## B.

The fruits of the search in *T.L.O.* resulted in the police filing delinquency charges against the student. Notwithstanding that the case implicated the student's liberty interests, we nonetheless relaxed the warrant and probable cause requirements because of the unique public-school context. We likewise have condoned other forms of administrative searches, free of traditional constitu-tional requirements, especially when unconnected with law en-forcement. For example, we observed recently that we would expect doctors or nurses at a State-run psychiatric hospital rou-tinely to search all areas of the hospital, including a patient's private room. *Stott, supra,* 171 *N.J.* at 363, 794 *A.*2d 120. Such

searches are necessary "to ensure that patients are not in a position to harm either themselves or others." *Ibid.*

Similarly, we dispensed with the requirements of probable cause and individual suspicion in permitting random drug testing of transit police officers in *N.J. Transit, supra,* 151 *N.J.* at 564–65, 701 *A.*2d 1243. In that case, New Jersey Transit Corporation, a public agency, adopted a random drug and alcohol testing policy consistent with federal transportation regulations. *Id.* at 537–38, 701 *A.*2d 1243. The agency sought to test, without individualized suspicion, transit police officers who carried firearms for security purposes and who performed safety-sensitive functions. *Id.* at 538, 701 *A.*2d 1243. The officers objected, claiming that the policy violated their right to be free of unreasonable searches and seizures under the New Jersey Constitution. *Id.* at 541, 701 *A.*2d 1243.

The tests involved the collection of urine samples in accordance with certain confidentiality and privacy protocols. In evaluating the officers' objections, we reviewed the pertinent federal decisions that have held that "a suspicionless search may be permissible when the search serves special needs, beyond the normal need for law enforcement." *Id.* at 548, 701 *A.*2d 1243 (internal quotation marks and citation omitted). We were satisfied "that the special needs test [under federal law] provides a useful analytical framework for considering the protections afforded by ... the New Jersey Constitution[.]" *Id.* at 556, 701 *A.*2d 1243. That framework, we explained, "enables a court to take into account the complex factors relevant in each case and to balance those factors in such a manner as to ensure that the right against unreasonable searches and seizures is adequately protected." *Ibid.*

We applied the special-needs test essentially for two reasons. First, we were convinced that the public agency had designed its testing policy "to promote public safety and not to serve law enforcement needs[.]" *Id.* at 559, 701 *A.*2d 1243. Second, we were assured that the agency had a "substantial interest in protecting its employees and the public[.]" *Ibid.*

In the course of its review the Court affirmed the general rule "that any government-compelled drug or alcohol testing is a search" within the constitutional meaning of that term. *Id.* at 543, 701 *A.*2d 1243. We then considered whether the agency's testing procedure had been "designed to address [the transit officers'] privacy concerns and to minimize the intrusion on the employee[s'] privacy." *Id.* at 560, 701 *A.*2d 1243. We ultimately upheld the random drug tests after weighing the officers' diminished expectation of privacy, the State's interest in conducting the tests, and what we termed "the adequate limitations on the obtrusiveness" of the urine-collection process. *Id.* at 564–65, 701 *A.*2d 1243. We analyzed the transit officers' claims solely within the framework of Article I, paragraph 7.

## IV.

Applying the above tenets, we agree with defendants that Hunterdon Central has presented a special need to "justif[y] the privacy intrusions at issue absent ... individualized suspicion." *N.J. Transit, supra,* 151 *N.J.* at 559, 701 *A.*2d 1243 (internal quotation marks and citation omitted) (alteration in original). The school's students obviously do not perform a security function, as did the transit officers in *N.J. Transit.* Like the testing policy for those officers, however, the one in this case does not expose those eligible for testing to criminal liability and, therefore, serves no direct law-enforcement need. More importantly, school officials have a duty to maintain order and discipline in the public schools, and "are obligated to take reasonable precautions for [the students'] safety and well-being." *Jackson, supra,* 51 *N.J.* at 235, 238 *A.*2d 685. Firmly rooted in State law, the requirement that school officials closely monitor schoolchildren contributes to our view that students possess diminished privacy expectations, justifying a special-needs analysis. *Cf. N.J. Transit, supra,* 151 *N.J.* at 545–47, 701 *A.*2d 1243 (reviewing case law regarding suspicionless searches in regulated industries).

Stated differently, the "special need" in this case derives from the unique public-school environment that already results in a relaxed set of search-and-seizure rules. The special relationship between school officials and students furnished the basis for this Court in *T.L.O.* to dispense with the warrant and probable cause requirements when evaluating suspicion-based searches within a public-school context. We similarly conclude that a need for suspicionless drug and alcohol testing derives from that same circumstance, which requires the Board to respond to documented problems of substance abuse affecting those students entrusted to its care.

Plaintiffs suggest that we should limit *T.L.O.'s* policy underpinnings to the Fourth Amendment and not rely on them here to support application of the special-needs test. We disagree. Although our *T.L.O.* opinion contains no analysis specific to Article I, paragraph 7, that omission does not indicate that the opinion's policy rationale applies solely to federal claims. Indeed, by citing numerous New Jersey statutes outlining the authority and responsibilities of school officials, *see T.L.O. supra*, 94 *N.J.* at 342–43, 463 *A.*2d 934, *T.L.O.* strongly suggests that the concepts and principles described in that opinion apply equally to searches analyzed under our State constitution. In other words, the public-school context that has grounded our *T.L.O.* analysis for nearly two decades now argues in favor of applying a special-needs test in the present dispute.

Moreover, we foreshadowed application of the special-needs test within a school setting in *N.J. Transit*. There, we cited *Vernonia*, describing that case as follows:

> In part, *Vernonia* turned on the "public-school context" where teachers and administrators have a "substantial need ... for freedom to maintain order," and where students " 'have a lesser expectation of privacy than members of the population generally[.]' " *Vernonia* pointed to a record of alcohol and drug abuse at the school and stressed the significance of deterring drug use among school children generally, and among athletes specifically. These interests weighed heavily against the students' diminished expectation of privacy and tipped the balance such that the Court found the school district's random drug testing policy reasonable.

[*N.J. Transit, supra,* 151 *N.J.* at 553, 701 *A.*2d 1243 (internal citations omitted).]

We included *Vernonia* in our discussion of the federal special-needs framework that this Court unanimously adopted in evaluating the testing policy for transit officers. That inclusion raised the possibility that such a framework might be appropriate in analyzing the kind of challenge now before us.

In sum, we conclude that *Vernonia's* special-needs approach provides an appropriate framework for evaluating plaintiffs' State constitutional claims. The analysis, however, does not end there. Within the special-needs framework, we now must determine whether Hunterdon Central's random drug and alcohol testing policy is reasonable based on a weighing of three factors. They are: the affected students' expectation of privacy, the search's degree of obtrusiveness, and the strength of the government's asserted need in conducting the search. We will address each factor separately and in that order.

## A.

We already have touched on the first factor by summarizing the special relationship between school officials and students, and we need not repeat that discussion. Suffice it to say that students generally have diminished privacy expectations born of the government's duty to maintain safety, order, and discipline in the schools. Student athletes, in particular, shed much of their personal privacy when deciding to join a team sport. That they must dress and undress in front of teammates and often shower in open facilities is common knowledge. *See Vernonia, supra,* 515 *U.S.* at 657, 115 *S.Ct.* at 2393, 132 *L.Ed.*2d at 577 (observing that "there is an element of communal undress inherent in athletic participation") (internal quotation marks and citation omitted).

Although not to the same extent, students involved in non-athletic activities similarly subject themselves to additional regulation or to situations in which their privacy is compromised. "Some of these clubs and activities require occasional off-campus travel and communal undress. All of them have their own rules

and requirements for participating students that do not apply to the student body as a whole." *Earls, supra,* 536 *U.S.* at 832, 122 *S.Ct.* at 2566, 153 *L.Ed.*2d at 745. Similarly, a student who operates a motor vehicle on school grounds requires a parking permit, a requirement not applicable to students who do not seek parking privileges.

The organizational *amici* more fully explain:

Student-athletes must have a preseason physical, acquire insurance coverage or sign an insurance waiver, and comply with rules of conduct, dress, grade point average, training hours and other rules as may be established for each sport. Students engaged in extracurricular activities often must also obtain insurance or sign insurance waivers for any extracurricular activity that extends the school's liability beyond the normal school-context, such as field trips, outings, events, conferences, and competitions away from school. They may have to subscribe to additional requirements, such as when the activities have required attire, training rules, or hours of practice and rehearsal, or other general regulations. Some extracurricular activities will not have the same elements of lack of privacy such as the communal undressing and locker room as athletics, but many extracurricular activities have elements of shared exposure to other student participants when performing specified activities such as the putting on of an organization's uniforms, or the general need to change into different required clothes for a particular event.

Given those realities and the traditional relationships between school officials and students, we are satisfied that the students affected by Hunterdon Central's random drug and alcohol testing program have a reduced expectation of privacy.

B.

We next evaluate the relative obtrusiveness of the search. We affirm the basic premise that a citizen's " 'excretory function traditionally [is] shielded by great privacy.' " *N.J. Transit, supra,* 151 *N.J.* at 559–60, 701 *A.*2d 1243 (quoting *Skinner, supra,* 489 *U.S.* at 626, 109 *S.Ct.* at 1418, 103 *L.Ed.*2d at 655). When we addressed and upheld the urine-collection process in *N.J. Transit,* we relied on the fact that the agency's procedures in that case "require[d] the urine sample to be collected in a manner that ensure[d] the modesty and privacy of [the affected] employees." *Id.* at 560, 701 *A.*2d 1243. We also noted that the collection site "permit[ted] individual privacy while a specimen [was] produced."

*Ibid.* The government also employed procedures requiring that initial positive readings had to be "analyzed a second time to guard against false positive results[.]" *Ibid.*

Hunterdon Central's policy mirrors those protections. Students provide their specimen samples in closed-door restrooms without being observed directly by adult monitors. In that respect, the collection process affords students greater personal privacy than the process in *Vernonia, supra,* which required male students to produce samples at a urinal while monitors were permitted to "listen for normal sounds of urination." 515 *U.S.* at 650, 115 *S.Ct.* at 2389, 132 *L.Ed.*2d at 572. The process here also is less invasive than the collection process in *Earls, supra,* in which a faculty monitor waited outside the restroom stall and " 'listen[ed] for the normal sounds of urination in order to guard against tampered specimens and to insure an accurate chain of custody.' " 536 *U.S.* at 832, 122 *S.Ct.* at 2566, 153 *L.Ed.*2d at 746. Hunterdon Central's process also contains safeguards designed to prevent false positive results. Plaintiffs do not dispute the efficacy of those safeguards, the accuracy of individual test results, or that the process is applied randomly to eligible students.

The school regards the test results as confidential in accordance with State and applicable federal regulations, as did the public agency in *N.J. Transit.* Moreover, the school's policy provides that medical personnel shall review any initial positive result with the student's family to ascertain whether the student currently is using a legally prescribed drug. If so, the test is reported as negative without further reporting to the school. That roughly equates with the protection afforded in *N.J. Transit* in which the agency did not compel employees "to provide information about prescription medication or other medical conditions." *Id.* at 560, 701 *A.*2d 1243.

Moreover, we view the policy's intrusiveness within the broader context of current New Jersey regulations. Under existing law, students must undergo medical examinations as they enter school. *N.J.A.C.* 6A:16–2.2(d)(1). Additionally, they must submit to an

examination once during early childhood (pre-school through third grade), once during pre-adolescence (grades four through six), and once during adolescence (grades seven through twelve). *Ibid.* Those examinations must include or result in documentation of immunization, a "[m]edical history including allergies, past serious illnesses, injuries and operations, medications and current health problems[,]" and health screenings "including height, weight, hearing, blood pressure, and vision[.]" *Id.* at (e).

Although a student's family physician can perform those services, school physicians serve as inspectors of last resort and are authorized themselves to examine students. *Id.* at (b). The relevant statute provides:

> In conducting such examinations of pupils the medical inspector may require pupils to loosen, open, or remove their clothing above the waist in a manner to facilitate inspection and examination, but in any such case the parents or guardians shall be notified in writing of such proposed examination and in such notice the presence of one of the parents or guardians shall be requested, and it shall be stated in the notice that in the absence of a parent or guardian there shall be present a nurse or teacher and in the examination of a female pupil the nurse or teacher present shall be of the female sex, and that if the parent or guardian objects to such examination, then the parent or guardian may file with the medical inspector a report of the family physician upon the condition for which such examination was deemed advisable by the medical inspector.

> [*N.J.S.A.* 18A:40–5.]

The above regulations apply equally to every student, not just to student athletes. *Compare N.J.A.C.* 6A:16–2.2(e) (regulating all students) *and* (h) (mandating more particular requirements for student athletes).

We find that the school's test policy limits the intrusion on the students' privacy interests and protects their personal dignity to the extent possible under the circumstances. Although the policy's intrusiveness sufficiently is circumscribed under current procedures, we observe that advances in the science of drug testing have made possible other collection techniques even less intrusive than urine collection. One such technique is oral-swab testing. According to the United States Office of National Drug Control Policy,

[t]races of drugs, drug metabolites, and alcohol can be detected in oral fluids, the generic term for saliva and other material collected from the mouth. Oral fluids are easy to collect—a swab of the inner cheek is the most common way. They are harder to adulterate or substitute, and collection is less invasive than with urine or hair testing. Because drugs and drug metabolites do not remain in oral fluids as long as they do in urine, this method shows more promise in determining current use and impairment.

[United States Office of National Drug Control Policy, *What You Need To Know About Drug Testing in Schools*, at 10 *available at* www.whitehousedrugpolicy.gov/pdf/drug_testing.pdf (last visited Apr. 15, 2003).]

Defendants acknowledge that "[s]ubsequent to this suit being filed, the science of drug testing has advanced and a urine sample is no longer necessary for accurate results. Rather, school districts may now opt for oral fluid testing with a swab." Defendants further indicate that Hunterdon Central now uses an oral-swab test for its suspicion-based program. We construe defendants' acknowledgment as an indication that the school will convert to oral-swab tests for its random-based program, provided that the Board is satisfied that using such tests will not unduly diminish the program's effectiveness. Because invasiveness to some degree is a dynamic factor, our analysis here is premised on that eventuality.

## C.

The remaining factor under the special-needs analysis requires that we evaluate the strength of the government's asserted need in conducting the search. That the United States as a whole confronts a drug and alcohol problem of significant magnitude in its public schools is beyond reasonable debate. *Earls, supra,* 536 *U.S.* at 834, 122 *S.Ct.* at 2567, 153 *L.Ed.*2d at 746–47 (referring to problem as "nationwide drug epidemic"); *Vernonia,* 515 *U.S.* at 661, 115 *S.Ct.* at 2395, 132 *L.Ed.*2d at 579 (stating that deterring student drug use "is important—indeed, perhaps compelling"). According to a recent national survey sponsored by the National Institute on Drug Abuse (through the auspices of the United States Department of Health and Human Services), teen drug use has decreased in recent years but still affects a wide

body of students. Although past-year use of marijuana among tenth graders nationally decreased slightly from 2001 to 2002, it remains at thirty percent, with nearly a third of students in that grade reporting using the drug. Press Release, National Institute on Drug Abuse, *2002 Monitoring the Future Survey Shows Decrease in use of Marijuana, Club Drugs, Cigarettes, and Tobacco*, at 2 (Dec. 16, 2002).

In New Jersey, data released in 1999 by then-Attorney General John J. Farmer, Jr., shows "virtually no change in young people's use of alcohol, marijuana, hallucinogens, cocaine, amphetamines and heroin" between 1995 and 1998. Press Release, New Jersey Department of Law and Public Safety, *State Releases Survey of Substance Abuse Among High School Students*, at 1 (Dec. 30, 1999). The data show that "[a]bout four in every five students (78.5%) report the use of alcohol at some time in their lives[,]" that "36.9% [report using marijuana] in the past year[,]" and that "[t]he most widely used illicit drugs, other than marijuana, are hallucinogens and amphetamines." New Jersey Department of Law and Public Safety, *Drug and Alcohol Use Among New Jersey High School Students 1999*, at 17–18. Of particular significance, the survey reveals that nearly sixty percent of responding students indicated that parental disapproval would prevent them from using drugs in the first instance. *Id.* at 89.

The national and statewide survey results cited above are updated versions of similar surveys previously released by the same entities. The Board relied in part on those earlier results, which are included in the record before us, in implementing its random-based program. As noted, the Board also relied on surveys conducted by the RMBSI that were directed specifically at Hunterdon Central. The results of those surveys, summarized at length above, indicate that drug and alcohol use among students at Hunterdon Central generally is consistent with national and statewide figures.

In addition to survey data, the record contains certified statements by numerous school personnel describing first-hand experi-

ences with students using drugs or alcohol at Hunterdon Central. Brady, the school's principal, indicated that she "personally became aware of two students snorting heroin on school premises" and that coaches, teachers, and other administrators similarly reported "their concern about what they perceive to be a growing problem." One student assistance counselor stated that the counseling workload had increased at least thirty-three percent in a three-year period and that "many of the referrals are athletes and students engaged in extracurricular activities." Lastly, the record indicates that there were three deaths due to heroin overdoses in municipalities within the school district, and that as recently as 2000, four students were known to have ingested illegal drugs while on school premises.

The facts described in the certifications, largely undisputed by plaintiffs, together with the survey results indicating that a third of the students in the upper grades continue to use marijuana, demonstrate the scope of the school's problem. Although the situation at Hunterdon Central does not equate with the "state of rebellion" that existed in *Vernonia*, the record clearly reveals illegal drug and alcohol use affecting a sizable portion of the student population. Viewing the record as a whole, we are satisfied that the Board was faced with a significant drug and alcohol problem when it expanded the random testing program to its present form.

We also conclude that the Board reasonably tailored its program to meet the scope and nature of the then-existing problem. Reasonableness in this context does not require that the Board possess irrefutable proof verifying the efficacy of random drug and alcohol testing in reducing substance abuse among students. Rather, it is enough that the Board believed that its program would have some measurable effect in attaining the Board's objectives. Those objectives include not only deterring drug and alcohol use, but encouraging those who test positive for such use to participate in rehabilitative programs. That second goal is self-executing in the sense that students who test positive are required

to receive counseling as a condition of returning to the suspended activity. The perceived successes with the policy's athletic component, when combined with other information considered by the Board, provided a sufficient basis for it to conclude that expanding the program would yield favorable results.

Such other information before the Board included a 1996 statewide survey showing that over fifty percent of responding students stated that parental disapproval would deter them from illegal drug use (as noted, that figure rose to nearly sixty percent in the 1999 survey). Those figures corroborate the Board's belief that its program would deter drug or alcohol use because students would want to avoid the negative consequences associated with that conduct, such as having their parents know and disapprove of it or losing the ability to participate in desired extracurricular activities.

We are aware of three studies that, although not conclusive, suggest that random drug testing programs curb student drug use. See *Lindquist v. City of Jersey City Fire Dep't,* 175 *N.J.* 244, 273–77, 814 *A.*2d 1069 (2003) (demonstrating Court's use of recent studies to assist it in resolving workers' compensation claim). With funding from the United States Department of Education, researchers connected with one study surveyed nine geographically diverse schools that employed student drug testing programs during the 2001–02 school year. Robert L. DuPont, Teresa G. Campbell & Jacqueline J. Mazza, *Report of a Preliminary Study: Elements of a Successful School–Based Student Drug Testing Program,* July 22, 2002, at ii *available at* www.datia.org/pdf_resources/prelim_study.pdf (last visited Apr. 15, 2003) (DuPont Study). The schools assessed effectiveness through a variety of methods, including tracking students who previously had tested positive for drug use, anecdotal evidence, measurable decreases in discipline problems, and student surveys. *Id.* at 14. The DuPont Study reports that "all of the school officials surveyed strongly supported their entire [student drug testing] programs and all were convinced that their [student drug testing] programs

benefited their entire school communities, including the students."
*Id.* at 18.

A second study surveyed seventy-one high school principals, whose schools had conducted random drug testing. Joseph R. McKinney, *The Effectiveness and Legality of Random Drug Testing Policies,* at 3 *available at* www.studentdrugtesting.org/Effectiveness.htm (last visited Apr. 16, 2003) (McKinney Study). Although it does not so indicate expressly, the McKinney Study appears limited to schools located in Indiana. Researchers asked the principals "to compare drug and alcohol activity during the 1999–2000 school year when drug testing policies were in effect with the 2000–01 school year when schools were not allowed to continue with their random drug testing policies." *Ibid.* The reason for the hiatus is that an intermediate appellate court in Indiana had ruled that such policies were unconstitutional, a ruling ultimately reversed by that state's highest court. *Linke v. Northwestern Sch. Corp.,* 763 *N.E.*2d 972 (Ind.2002).

After reviewing the collected statistics, the author of the McKinney Study concluded that

[r]andom drug testing policies appear to provide a strong tool for schools to use in the battle to reduce alcohol and drug usage among teens .... While the legal debate will continue over drug testing in schools, this study does show that random drug testing policies are effective in reducing the temptation to use drugs and alcohol.

[McKinney Study, *supra,* at 4.]

Researchers connected with a third study looked at two Oregon high schools during the 1999–2000 school year, one with mandatory drug testing as a condition of sports participation, and a control school without drug testing. Lynn Goldberg, Diane Elliot, David P. MacKinnon, Esther Moe, Kerry S. Kuehl, Liva Nohre & Chondra M. Lockwood, *Drug Testing Athletes to Prevent Substance Abuse: Background and Pilot Study Results of the SATURN (Student Athlete Testing Using Random Notification) Study,* Journal of Adolescent Health, at 16–17 (Jan. 2003). The school that drug-tested student athletes had a rate of illicit drug use that was about one-fourth that of the control school. *Id.* at 24.

After warning that there were limitations to their study, the authors concluded that "[a] policy of random drug testing surveillance appears to have significantly reduced recent drug use among adolescent athletes." *Ibid.*

A recently published fourth study suggests a contrary result, namely, "that drug testing in schools may not provide a panacea for reducing student drug use that some ... had hoped." Ryoko Yamaguchi, Lloyd D. Johnston & Patrick M. O'Malley, *Relationship Between Student Illicit Drug Use and School Drug–Testing Policies,* Journal of School Health, at 164 (Apr. 2003) (Michigan Study). In that study, which surveyed 76,000 students nationwide, researchers found that "drug testing (of any kind) was not a significant predictor of student marijuana use in the past 12 months. Neither was drug testing for cause or suspicion." *Id.* at 163.

Both the SATURN Study and the Michigan Study were supported by grants from the National Institute on Drug Abuse. And like the prior studies suggesting more favorable results from the school's perspective, the Michigan Study has limitations.

[The Michigan Study] does not differentiate between schools that do intensive, regular random screening and those that test only occasionally. As a result, it does not rule out the possibility that the most vigilant schools do a better job of curbing drug use.

. . . .

The National Institute on Drug Abuse said it would take several more such studies before any certainty about the efficacy of testing can be established. More research is being explored, it said, but the results are probably years away. [Gregg Winter, *Study Finds No Sign That Testing Deters Students' Drug Use,* N.Y. Times, May 17, 2003, at A14.]

Thus, research in this area is not complete and to date has yielded mixed results. As a whole, the research is relatively new. Presumably, a school's testing program gains effectiveness as a deterrent only gradually, as consistent implementation signals to students a new consequence to illicit drug use. The three studies that suggest that random testing curbs student drug and alcohol use, and the one study that suggests no such effect, are simply

competing factors to be weighed when evaluating the reasonableness of the challenged program. We also consider the data related specifically to Hunterdon Central, in addition to the certifications of school officials described above. On balance, we conclude that reasonableness under Article I, paragraph 7 does not require the Board to wait for a definitive study regarding drugtesting efficacy before addressing a problem that it already knows affects a sizable number of students.

D.

We emphasize that no part of our analysis is intended as an endorsement of the Board's decision on policy grounds. Whether the Board's program reflects a wise or appropriate expenditure of resources is for the Board and its local constituents to determine. Our sole task is to evaluate the Board's action within the special-needs framework as articulated by our federal counterpart and as applied by this Court in *N.J. Transit.* Having considered the affected students' diminished expectation of privacy, the sufficient limitations on the obtrusiveness of the testing, and the substantial governmental interest in maintaining a school environment free of drugs and alcohol, we find that Hunterdon Central's program passes muster under Article I, paragraph 7 of the New Jersey Constitution.

V.

A.

Urging a contrary conclusion, plaintiffs argue that we should construe Article I, paragraph 7 as providing greater protection to Hunterdon Central's students than that available under the Fourth Amendment. We find nothing in the history of Article I, paragraph 7, in preexisting State law, or in the prevailing attitudes of the public that would warrant that result. See *State v. Hunt,* 91 *N.J.* 338, 359–68, 450 *A.*2d 952 (1982) (Handler, J., concurring) (articulating criteria for determining when to depart

from federal law). To the contrary, as the above discussion demonstrates, our law regarding searches within the public-school context generally has mirrored federal law, encapsulating similar if not identical concepts and concerns.

On more than one occasion this Court has interpreted the State's constitution as affording its citizens greater protections than those afforded by its federal counterpart. *See, e.g., Cooke, supra,* 163 *N.J.* at 670, 751 *A.*2d 92 (declining to apply reduced federal standard when evaluating automobile exception to warrant requirement); *State v. Pierce,* 136 *N.J.* 184, 209, 642 *A.*2d 947 (1994) (refusing to adopt blanket rule that would have permitted warrantless automobile searches incident to all arrests); *State v. Hempele,* 120 *N.J.* 182, 195, 576 *A.*2d 793 (1990) (finding privacy interest in curbside garbage); *State v. Novembrino,* 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987) (declining to find good-faith exception to exclusionary rule); *Hunt, supra,* 91 *N.J.* at 348, 450 *A.*2d 952 (finding privacy interest in telephone billing records). Those instances, by and large, involved cases in which a citizen was exposed to criminal liability, with the Court concluding that local conditions required departure from federal jurisprudence.

In the case of suspicionless drug testing, however, we agree with Judge Stern that "the courts of New Jersey, to date, seem to follow the federal Supreme Court when dealing with [those types of] issues[.]" *Joye, supra,* 353 *N.J.Super.* at 612, 803 *A.*2d 706 (citing *N.J. Transit, supra,* 151 *N.J.* at 546–49, 701 *A.*2d 1243 (upholding random drug tests of transit police under federal special-needs analysis); *International Fed'n of Prof'l & Technical Eng'rs, Local 194A v. Burlington County Bridge Comm'n,* 240 *N.J.Super.* 9, 19–25, 572 *A.*2d 204 (App.Div.) (upholding drug testing of public employees involved in operation of bridges under federal special-needs analysis), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990)). Consistent with that observation, we previously overruled one reported decision that had invalidated random drug tests for police officers to the extent that it analyzed the officers' claims inconsistent with the special-needs test. *See Fraternal*

*Order of Police v. City of Newark,* 216 *N.J.Super.* 461, 524 *A.*2d 430 (App.Div.1987), *overruled by N.J. Transit, supra,* 151 *N.J.* at 558, 701 *A.*2d 1243. Similarly, we now overrule the Chancery Division's decision in *Odenheim v. Carlstadt–East Rutherford Regional School District,* 211 *N.J.Super.* 54, 510 *A.*2d 709 (1985), which struck down a school's policy of including urine-drug screening in student medical examinations, to the extent that it is inconsistent with today's analysis.

Our disposition is in accord with *Desilets v. Clearview Regional Board of Education,* 265 *N.J.Super.* 370, 627 *A.*2d 667 (App.Div. 1993). In that case, a junior high school sponsored a voluntary field trip, using buses provided by the school board. A parent of each participating student had to sign a permission slip, which stated that students' hand luggage would be searched. Although a search of one student's items revealed no contraband or other inappropriate items, his mother nevertheless brought an action against the board alleging that the search violated the Fourth Amendment and its New Jersey counterpart. *Id.* at 373, 627 *A.*2d 667.

The Appellate Division affirmed the trial court's dismissal of the parent's suit, relying on many of the same concepts underlying our holding here. The court observed:

> The need for close supervision in the schoolhouse is intensified on field trips where opportunities abound to elude the watchful eyes of chaperones. Administrators and teachers have a duty to protect students from the misbehavior of other students.

> . . . .

> We are persuaded that the search was justified at its inception by the unique burdens placed on school personnel in the field trip context and that the search limited to hand luggage was reasonably related to the school's duty to provide discipline, supervision and control.
>
> [*Id.* at 380, 382, 627 *A.*2d 667.]

The court also rejected the parent's contention that, in conducting the suspicionless search, school officials had violated Article I, paragraph 7. The panel unanimously concluded:

We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart. We note that in its *T.L.O.* opinion the New Jersey Supreme Court analyzed the search and seizure issue under the Fourth Amendment to the United States Constitution, and did not suggest that New Jersey's organic law imposed more stringent standards.

[*Id.* at 382, 627 *A.*2d 667.]

## B.

As did the trial court, plaintiffs also refer to a separate provision, Article I, paragraph 1, which provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Plaintiffs cite numerous decisions of this Court construing that provision, contending that they "are significant because they evidence this State's heightened concern for protecting personal privacy in a wide variety of contexts."

There is no question that Article I, paragraph 1 forms the basis of several decisions implicating highly personal family-planning issues, such as sterilization and reproductive choice. *See, e.g., Planned Parenthood v. Farmer,* 165 *N.J.* 609, 762 *A.*2d 620 (2000) (citing Article I, paragraph 1 in invalidating statute conditioning minor's right to abortion on parental notification); *Right to Choose v. Byrne,* 91 *N.J.* 287, 450 *A.*2d 925 (1982) (invoking Article I, paragraph 1 in invalidating statute prohibiting Medicaid funding for non-life-threatening abortions); *In re Grady,* 85 *N.J.* 235, 426 *A.*2d 467 (1981) (referring to Article I, paragraph 1 in case involving sterilization of mentally incompetent persons).

Those cases, however, do not suggest that the right of privacy inherent in Article I, paragraph 1 should be interchanged with the privacy interests that otherwise would be reviewed under this Court's search-and-seizure jurisprudence. To the contrary, we consistently have separated the two lines of analysis, reserving exclusively to Article I, paragraph 7 any question implicating one's

privacy interest in connection with a governmental search, including compelled collection of one's bodily fluids. *See, e.g., State v. Ravotto,* 169 *N.J.* 227, 777 *A.*2d 301 (2001) (analyzing exclusively under Article I, paragraph 7 and its Fourth Amendment analogue State's forced taking of blood to test alcohol content); *N.J. Transit, supra,* 151 *N.J.* 531, 701 *A.*2d 1243 (evaluating random drug test involving urine collection exclusively under Article I, paragraph 7). We adhere to that approach in resolving the present dispute.

## C.

Plaintiffs do not argue that participating in extracurricular activities itself rises to a constitutional right. See *Todd v. Rush County Schs.,* 133 *F.*3d 984, 986 (7th Cir.) (observing that "extracurricular activities, like athletics, are a privilege") (internal quotation marks and citation omitted), *cert. denied,* 525 *U.S.* 824, 119 *S.Ct.* 68, 142 *L.Ed.*2d 53 (1998). Rather, they contend that such activities "are sufficiently important to an individual's educational success that the government's conditioning their availability on the relinquishment of the right to be free from suspicionless searches warrants careful scrutiny under Article I, ¶ 7."

We recognize, of course, the intrinsic value of extracurricular activities. So, too, have we identified drug use as one of the obstacles that some students must overcome to "receive a worthwhile education." *Abbott v. Burke,* 119 *N.J.* 287, 372, 575 *A.*2d 359 (1990) (*Abbott* II). We have given the Board's policy the careful scrutiny urged by plaintiffs. In so doing, we cannot conclude that the importance of extracurricular activities outweighs the Board's articulated need to engage in reasonable efforts to enhance the educational environment for all students by reducing substance abuse within its high school. We also echo Justice Breyer in observing that the challenged program "preserves an option for a conscientious objector. He can refuse testing while paying a price (nonparticipation) that is serious, but less severe than expulsion

from the school." *Earls, supra,* 536 *U.S.* at 841, 122 *S.Ct.* at 2571, 153 *L.Ed.*2d at 752 (Breyer, J., concurring).

### D.

Plaintiffs raise other concerns. Joan Greiner legitimately questions whether the school's policy would force students to disclose personal medical histories. Beyond what State law already requires in terms of confidentiality of student health records, the program appears to address Greiner's concern by treating as negative any test result indicating that a student is using a lawfully prescribed drug. As we understand it, any laboratory result indicating prescription drug use simply is not reported to the school.

The challengers also contend that the record contains no direct proof that illegal drug and alcohol use exists among student athletes and those engaged in other extracurricular activities, to whom the testing policy applies. To be sure, the RMBSI survey results do not distinguish between those who engage in extracurricular activities and those who do not. The Board, however, indicates that its expanded policy applies to about 2,000 of the school's 2,500 students, or about eighty percent of the entire student body. In view of that large percentage, the Board acted reasonably in considering the general survey results as relevant indicators of drug and alcohol use among the eligible test group. Moreover, the certification of a retired student assistance coordinator indicates that during her tenure the SAP dealt with over three hundred referrals a year, and that "many of the referrals are athletes and students engaged in extracurricular activities."

 Urging us to eschew the approaches taken in *Vernonia* and *Earls,* plaintiffs emphasize that the Supreme Court decided those cases over the strong objections of dissenting justices. Unquestionably, reasonable minds and courts can and do differ on these issues. In that respect, we again agree with Justice Breyer that this type of challenge presents a "close question involving the interpretation of constitutional values[.]" *Earls, supra,* 536 *U.S.* at 841, 122 *S.Ct.* at 2571, 153 *L.Ed.*2d at 751 (Breyer, J., concur-

ring). We also agree with his suggestion that wide community approval of a school's drug and alcohol testing program is relevant in deciding such questions. *See ibid.*

We do not, however, suggest that a majority of citizens in any one community can bend the constitution to their collective will. Rather, we merely follow prior case law that instructs us to consider society's viewpoint when evaluating whether an expectation of privacy is entitled to enhanced protection in a given circumstance. See *Stott, supra,* 171 *N.J.* at 354, 794 *A.*2d 120 (observing that "subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable") (internal quotation marks and citation omitted). According to the Board's president, no parents of students eligible for testing (aside from plaintiffs) have expressed opposition to the school's program. Although parental sentiment is not controlling, we accord it some weight, especially within the public-school context in which school officials often assume a parent-like role. See *Vernonia, supra,* 515 *U.S.* at 665, 115 *S.Ct.* at 2397, 132 *L.Ed.*2d at 582 (noting apparent support of students' parents in upholding school district's random student drug tests).

Similarly, our analysis is informed by the fact that the Board employed a meticulous two-year process resulting in the expanded program. In that regard, the Board adopted the current policy only after it appointed a task force to review the relevant issues, commissioned two studies by an outside firm, held public hearings to elicit the community's views, and considered the other information contained in the record. Those deliberate steps fortify our conclusion that the program before us reflects a reasoned attempt by the Board and approving parents to address a documented drug-and-alcohol problem at the school.

## VI.

### A.

The dissent echoes the same or similar arguments raised by plaintiffs that we already have addressed. Although we respect

the concern for privacy that those arguments reflect, we are not persuaded by them. We likewise disagree with the dissent's interpretation and application of the relevant case law that is contrary to our analysis set forth throughout this opinion. Our colleagues, for example, criticize at length the *Earls* decision. We reiterate that federal decisions such as *Vernonia* and *Earls* do not control the analysis under our State's constitution, but serve only as guides. Even if we were to accept the dissent's criticism of *Earls,* the program before us carries stronger arguments in favor of constitutionality than the program reviewed in that case for two reasons.

First, unlike the record in *Earls,* the record in this case contains two sets of data collected by an outside firm, and other information specifically defining the scope of the school's drug and alcohol problems. · The dissent suggests that the survey results were compromised because a pharmaceutical company funded them. There is nothing in the record to support that suggestion. Nor is there any indication that the RMBSI conducted anything but an unbiased study on the Board's behalf. The record here also includes data relating to three deaths attributed to drug overdoses occurring in municipalities within the school district.

Second, as previously stated, the specimen-collection process affords Hunterdon Central's students greater personal privacy than the processes in *Vernonia* and *Earls.* With the anticipated arrival of swab-tests, that process will become even less intrusive than the tests at issue in the prior federal cases. The critical point is that, in citing *Earls* and *Vernonia,* we have not been insensitive to New Jersey's specific privacy concerns. Instead, we have replicated the approach taken by the United States Supreme Court only because of our conclusion that existing New Jersey case law and the present record warrant it.

On a related issue, the dissent barely mentions a critical element of prior suspicionless testing decisions, that is, an inquiry into the invasiveness of the collection procedure and the embarrassment or stigma (or lack thereof) that might attach to it.

Under the challenged program, no faculty monitor stands outside a stall or open urinal, and no student is singled out as a potential drug user merely because he or she randomly is tested. That stands in marked contrast to students who are tested under a suspicion-based program in which a certain stigma immediately attaches.

Perhaps most important, no student is exposed to criminal liability because, at its heart, the program is designed to promote the health of Hunterdon Central's students and their ability to learn. Therefore, we have not applied a "traditional" search-and-seizure analysis for the simple reason that this is not a traditional case. Our holding thus is unrelated to the many criminal-law decisions in which we have afforded New Jersey citizens greater protections than those found under the federal constitution when the relevant circumstances have warranted that result.

While it has harsh words for *Earls,* the dissent cites approvingly to *Vernonia,* even though *Vernonia's* holding potentially reaches student athletes on a scale similar to the "mass" scale that our colleagues so negatively describe in this case. We imagine that the same arguments concerning the wide scope of the government's action were voiced when the State first implemented suspicionless sobriety stops to check motorists for possible intoxication. That nearly six million drivers are subject to those stops does not make them unconstitutional. (There are approximately 5.7 million licensed motorists in this State. New Jersey Motor Vehicle Commission, *About MVC, available at* www.state.nj.us/mvc/about_mvc.html (last visited June 26, 2003). In theory, all are subject to suspicionless checkpoint stops within the boundaries of prior case law. *State v. Hester,* 245 *N.J.Super.* 75, 584 *A.*2d 256 (App.Div.1990).)

Although the analogy is imperfect, the concept is similar. The fact that a large number of high school students theoretically might be subject to drug testing does not render such tests constitutionally infirm. What that fact does require is that we carefully balance the interests at stake, which we have done in this

case by virtue of applying all of the elements of the special-needs test. More significant, we state again that our holding is not to be construed as an automatic green light for schools wishing to replicate Hunterdon Central's program. Instead, those schools will have to base their intended programs on a meticulously established record, similar to the record here. Whether that becomes an easy or difficult task for other school boards to accomplish remains to be seen. For now, we pass judgment only on the program before us.

The dissent further contends that upholding Hunterdon Central's program somehow reflects bad civics. So long as its program is reasonable, we leave it to the Board and its local constituents to determine what "lesson" the program might convey to students. It might well be that this case will instill in students an appreciation of the rule of law, namely, that officials are permitted to maintain a testing policy not on some whim, but only after they have justified it under constitutional standards. Or the lesson might be that there are consequences to illegal drug and alcohol use, both in terms of a student's health and his or her ability to participate in selected activities. In any event, our only task is to evaluate the program's constitutionality, not to substitute our value system for that of the Board in respect of the broader public policy underlying its program.

The dissent also suggests that the expansion of the program to non-athletic extracurricular activities is especially infirm on the ground that students who engage in such activities do not implicate their own personal safety to the same degree as student athletes. True, some activities by their nature present more obvious concerns than others. We can envision, however, that many non-athletic activities involve giving students access to the school's more isolated areas, *e.g.*, a publications room for the student newspaper, literary magazine, or school yearbook; a theatre or choir loft; or a band alcove. Because every such activity poses to some extent a challenge to the Board's supervisory authority, we cannot conclude that the Board has acted unrea-

sonably in subjecting participants to elevated scrutiny for purposes of random testing. *Cf. Desilets, supra,* 265 *N.J.Super.* at 380, 627 *A.*2d 667 (justifying suspicionless searches on field trips in part because "[t]he need for close supervision in the schoolhouse is intensified on [such] trips where opportunities abound to elude the watchful eyes of chaperones").

Similarly, students wishing to park on school grounds ask school officials to extend their supervisory authority beyond the classroom. In response, the school must maintain an adequate lot, regulate traffic, and safeguard students from collision and other risks attached to motor vehicle use. That asked-for extension of supervision, touching as it does on issues of student safety, makes parking akin to an extracurricular activity triggering a special-needs analysis. From that perspective, the Board's undifferentiated treatment of athletic and non-athletic extracurricular activities does not breach the bounds of reasonableness under Article I, paragraph 7 insofar as random drug and alcohol testing is concerned.

Lastly, of the four studies that we have discussed, the dissent concentrates on the Michigan Study. We reiterate our belief that the better approach is not to rely selectively on any one study, but instead to view the literature as a whole. When evaluating the overall reasonableness of the Board's decision, the Michigan Study is merely one factor to be considered along with the studies before it yielding contrary results. The narrow question remains not whether there is definitive proof concerning drug-testing efficacy, but whether the reasonableness requirement under our State's constitution bars the Board and approving parents from implementing such tests in view of Hunterdon Central's documented drug and alcohol problems. For the reasons already stated, we conclude that it does not.

### B.

We offer these closing observations. In upholding the testing of student athletes in *Vernonia, supra,* the Supreme Court accepted

the school district's view that the district's drug problem had been fueled, at least in part, by the so-called "role-model" effect of athletes' drug use. 515 *U.S.* at 663, 115 *S.Ct.* at 2396, 132 *L.Ed.*2d at 581. According to the Court, that circumstance contributed to the policy's efficacy. *Ibid.* In this case, defendants express a similar view, which we find equally reasonable. We reject the notion that students engaged in extracurricular activities are not role models to the same degree as student athletes. The nostalgic image of the star quarterback as the one most imitated by his peers has been supplemented by other images. Today, the lead actress in the school play, the editor-in-chief of the school newspaper, and similar leaders in non-athletic settings have joined student athletes, both male and female, in serving as student role models.

From that perspective, the Board's decision to include both groups of students within the eligible testing pool appears rational to the Court. According to the Board, it considered *Vernonia* when it adopted its initial policy. As noted by its counsel, that also explains why the Board has not expanded its policy to the entire student population—because federal law, as reflected in *Vernonia* and *Earls*, has not allowed such expansion. In any event, subjecting all students to testing would eliminate the ability of a conscientious objector to opt out of the eligible pool. As already suggested, that option contributes to the program's reasonableness; its removal, therefore, would jeopardize the program's constitutionality.

We emphasize that this is not "a decision opening broad vistas for suspicionless searches[.]" *Chandler v. Miller*, 520 *U.S.* 305, 321, 117 *S.Ct.* 1295, 1304, 137 *L.Ed.*2d 513, 527 (1997). The central factor compelling our holding, namely, the unique public-school context, also serves as its primary inhibitor. By its own terms, today's decision should not extend beyond the schoolhouse walls. We also repeat that any future program will be assessed on the precise record on which it is based within the framework of the special-needs test. Under that test, we conclude that there is

room in our State's constitution for school officials to attempt to rid Hunterdon Central of illegal drugs and alcohol in the manner sought here.

## VII.

The Board's random drug and alcohol testing program is permissible under Article I, paragraph 7 of the New Jersey Constitution. Accordingly, the judgment of the Appellate Division is affirmed.

LaVECCHIA, J., dissenting.

A majority of our Court today holds that it is permissible under our State Constitution to subject public school students to mass suspicionless drug testing. I respectfully dissent.

The desire to wage war on drugs should not be permitted to coarsen our sensitivity to constitutional protections. The requirement that searches be reasonable and, at a minimum, based on some particularized suspicion is a constitutional mandate that applies to juveniles as well as adults. The protections of our State Constitution should not be shut out of our schoolhouses. In my view, the majority's application of the special-needs doctrine to support the school drug-testing program at issue here seriously erodes the traditional jurisprudential analysis governing searches and seizures. Simply put, a routine regimen of random drug testing of students who wish to avail themselves of the educational and social enhancements offered through extracurricular school activities ought not be permitted—certainly not on the showing made by this school district that in no way ties any drug use to the group targeted for suspicionless testing. The record is devoid of any special need to permit this random drug testing.

The Court's holding will reverberate throughout the State's system of public school education, and result in shearing an estimated quarter of a million New Jersey public school students of the right to be free of suspicionless drug testing. For those students, state constitutional protection against government-initi-

ated suspicionless searches of their bodily fluids is now conditioned on their giving up the opportunity to participate in extracurricular activities. That is the wrong lesson for our system of public school education to teach the young citizens entrusted to its care. As Justice Brandeis recognized, "[o]ur Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States,* 277 *U.S.* 438, 485, 48 *S.Ct.* 564, 575, 72 *L.Ed.* 944, 960 (1928).

I would conclude, as did the Honorable Naomi Eichen in her thoughtful and compelling dissent below, that the expansive random drug-testing program of the Hunterdon Central Regional High School Board of Education (Hunterdon Central) violates Article I, paragraph 7 of the New Jersey Constitution. *Joye v. Hunterdon Cent. Reg'l High Sch.,* 353 *N.J.Super.* 600, 615, 803 *A.*2d 706 (App.Div.2002).

I.

This case involves a challenge to a program of the Hunterdon Central Regional Board of Education that results in requiring approximately eighty percent of the student population at this regional high school to submit to random drug testing. Specifically, the program requires all ninth through twelfth graders who wish to participate in extracurricular sports, clubs, and other activities, as well as those students who apply for school parking privileges, to submit to routine, random drug testing.[1] That protocol of drug testing was proposed as an enhancement to the school district's existing suspicion-based testing program. Indeed,

---

[1] The most recent report by the New Jersey Department of Education indicates that there are approximately 332,426 students in grades nine through twelve in New Jersey's public schools. New Jersey Vital Education Statistics 2001–2002, *available at* http://www.state.nj.us/njded/data/vitaled/0102/. Assuming statewide application of the majority's holding, and assuming that, as in Hunterdon County, eighty percent of students statewide participate in extracurricular activities, the majority's holding may affect approximately 265,940 New Jersey students.

the district's efforts to deter students from drug and alcohol use are multifaceted. School administrators engage in searches of student lockers and conduct "dog-sniffing sweeps" in conjunction with the county prosecutor. Furthermore, drug and alcohol education is a required part of the curriculum and a student assistance program provides counseling for students and their families.

In July 1997, the school board adopted a policy that authorized the routine random drug testing of student athletes. As justification for the policy the board cited a survey of the student body that it commissioned during the 1996–1997 school year, although the record does not disclose any connection between the survey results and the student athlete population targeted for testing. What the record does reveal is that the survey was funded by Roche Diagnostic Systems (Roche), a New Jersey pharmaceutical company that produces drug-testing kits, and was administered by the Rocky Mountain Behavioral Science Institute, Inc. (RMBSI). Students were surveyed using a self-administered, paper-and-pencil questionnaire that required approximately thirty-five minutes to complete. Coordinators of the survey selected students to "represent" the Hunterdon Central student body, but it is unclear how that selection was made. Ultimately, 557 students, or approximately twenty-four percent of students enrolled at Hunterdon Central, were surveyed. The sample population consisted of 180 freshman, 123 sophomores, 145 juniors, and 109 seniors.

In general, the questionnaire inquired about history, current frequency, and intensity of drug and alcohol use. Data also was collected on student perceptions of drug availability at the school. The questionnaire contained controls to ensure accuracy and detect inconsistent or exaggerated responses. Approximately forty consistency checks were performed on each survey. As a result, one percent of the students tested were classified as "inconsistent responders" and their responses were excluded from the data compilations.

The anonymous survey results were categorized according to whether students ever had tried alcohol or various drugs, had

used such substances in the previous twelve months, and had used them in the last thirty days. Students were categorized as low, medium, and high drug users based on their survey responses. Low drug users included students who had tried a drug, were light users of alcohol, or whose drug use was negligible. High drug users included poly-substance, stimulant, heavy marijuana, and heavy alcohol users. (Presumably, terms such as "light" or "heavy" substance use were quantified on the questionnaire itself.)

The 1996–1997 survey results indicated, among other things, that 37% of freshman, 45% of sophomores, 46% of juniors, and 54% of seniors had used alcohol in the last month. Those who used marijuana in that month included 7% of freshman, 15% of sophomores, 15% of juniors, and 19% of seniors. Percentages of students who had ingested other substances during the last month, including, but not limited to, cocaine, barbiturates, stimulants, inhalants, and hallucinogens, ranged from 0 to 8%. A follow-up survey conducted during the 1999–2000 school year revealed lower percentages in these categories. Those latter results indicated that 21% of freshman, 38% of sophomores, 47% of juniors, and 52% of seniors consumed alcohol in the previous month. Marijuana use in the previous month was recorded at 2% of freshman, 10% of sophomores, 13% of juniors, and 13% of seniors. Use of other substances ranged from 0 to 6%.[2]

The new policy of requiring random drug tests for student athletes was not accepted universally in the Hunterdon Central community. Parents and students spoke out against it. A rift developed between the board of education and the school's athletic booster club. The board responded to the concerns by appointing

---

[2] The results of the follow-up survey conducted during the 1999–2000 school year signaled an overall trend toward less substance use. In most categories less use was assessed. Even in the high risk category of multi-drug users, the substance use rates went down: freshman—57% down (1.4% to 0.6%); sophomores—100% down (2.8% to 0%); juniors—14% down (5.1% to 4.4%); seniors—52% down (6.6% to 3.2%).

a "Drug Testing Task Force" charged with evaluating the district's current programs of drug testing.

The Task Force issued a report in November 1998, recommending that student athletes not be singled out for random drug testing. Instead, the report suggested that the program of random drug testing be expanded to apply to all students who participate in extracurricular activities. In addition, the Task Force recommended that the grant of parking privileges to students be conditioned on submitting to random drug testing. The Task Force's report stated plainly its intention to pattern the recommended reach of a drug-testing program on developing federal case law concerning Fourth Amendment challenges to random drug-testing programs. The report stated that the Board had wished to test randomly a broader group of students when it established its initial program of testing student athletes, but believed that the facts in *Vernonia School District 47J v. Acton,* 515 *U.S.* 646, 115 *S.Ct.* 2386, 132 *L.Ed.*2d 564 (1995), constrained broader action at that time. According to the Task Force, a more recent decision from the Seventh Circuit Court of Appeals, *Todd v. Rush County Schools,* 133 *F.*3d 984 (1998), supported an expansion of the school's program of random testing. Notably, the Task Force report did not suggest that the surveys taken of Hunterdon Central students indicated any particularized drug or alcohol problem among students participating in extracurricular activities, or among students who drove motor vehicles to school and parked on the grounds. Nor has that assertion been advanced in these proceedings.

On January 18, 2000, the Board approved expansion of its program of random drug testing to include the student groups identified in the Task Force report. Plaintiffs, three parents on behalf of their student children attending Hunterdon Central at the time of the filing of the action, brought the instant challenge to the constitutionality of that expanded program. The late Honorable Robert E. Guterl held that the program violated Article I,

paragraph 7 of the New Jersey Constitution and issued a permanent injunction prohibiting its implementation.

The Appellate Division, in a divided opinion, reversed the holding that the drug-testing program was unconstitutional and remanded for further proceedings. *Joye, supra,* 353 *N.J. Super.* at 615, 803 *A.*2d 706. This appeal is before us as of right based on Judge Eichen's dissent. Judge Eichen agreed with the trial court "that all of the targeted students had an undiminished privacy expectation in their excretory functions and that in the absence of any showing of a particularized special need for the testing" the program of random drug testing was violative of Article I, paragraph 7 of the New Jersey Constitution. *Id.* at 615, 803 *A.*2d 706.

## II.

There is no question but that a urine test to detect drug and alcohol use by students constitutes a "search" subject to Article I, paragraph 7 protections. On that the parties agree. Nor are the school district's procedures for specimen collection contested by plaintiffs. This appeal involves a single issue: whether it is reasonable to subject these targeted public school pupils (to wit, students who participate in extracurricular activities or who seek school parking permits) to the school district's program of random and routine drug testing.

## A.

Any discussion of student searches must start with *New Jersey v. T.L.O.,* 469 *U.S.* 325, 105 *S.Ct.* 733, 83 *L.Ed.*2d 720 (1985). In *T.L.O.,* "special needs" permitted dispensing with the normal warrant and probable-cause requirements and allowed substitution of a reasonableness test because school officials demonstrated a justified and immediate need to act to enforce school rules to maintain an orderly school environment without the constraint of those two requirements. T.L.O. was caught smoking in a school lavatory and was brought before the assistant vice principal for questioning. *Id.* at 328, 105 *S.Ct.* at 735, 83 *L.Ed.*2d at 726.

When she denied ever having smoked, the principal searched her purse and found an offending pack of cigarettes, as well as drug paraphernalia. *Ibid.*, 105 *S.Ct.* at 736, 83 *L.Ed.*2d at 726. In connection with delinquency charges later filed against her, T.L.O. claimed the school official's search of her purse violated the Fourth Amendment. *Id.* at 329, 105 *S.Ct.* at 736, 83 *L.Ed.*2d at 726. The United States Supreme Court agreed, but explained that requiring a warrant and individualized suspicion at a level that satisfied probable cause was not required for searches for evidence of a school rule violation. *Id.* at 340–41, 105 *S.Ct.* at 742, 83 *L.Ed.*2d at 733–34. Instead, the Court applied a two-part test:

[F]irst, one must consider "whether the ... action was justified at its inception" ...; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place[.]" Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

[*Id.* at 341–42, 105 *S.Ct.* at 742–43, 83 *L.Ed.*2d at 734–35 (citations omitted).]

The Court cautioned, however, that a reasonableness standard may not invade the interests of students any more "than is necessary to achieve the legitimate end of preserving order in the schools." *Id.* at 343, 105 *S.Ct.* at 743, 83 *L.Ed.*2d at 735–36. Justice Blackmun underscored that warning in a concurring opinion that introduced the phrase "special needs" to emphasize that the reasonableness standard is an exception, not the rule: "Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement *impracticable*, is a court entitled to substitute its balancing of interests for that of the Framers." *Id.* at 351, 105 *S.Ct.* at 748, 83 *L.Ed.*2d at 741. (Blackmun, J., concurring) (emphasis added).

The question whether special needs could support suspicionless searches of persons would be addressed thereafter in a series of cases in which the Supreme Court recognized that "[i]n limited

circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner v. Ry. Labor Executives' Ass'n*, 489 *U.S.* 602, 624, 109 *S.Ct.* 1402, 1417, 103 *L.Ed.*2d 639, 664 (1989). Accordingly, in certain circumstances the Court has placed its imprimatur on the use of random drug testing of categories of individuals. *Id.* at 633, 109 *S.Ct.* at 1421–22, 103 *L.Ed.*2d at 670 (authorizing suspicionless program of drug testing of train operators); *Nat'l Treasury Employees Union v. Von Raab*, 489 *U.S.* 656, 677, 109 *S.Ct.* 1384, 1396–97, 103 *L.Ed.*2d 685, 709 (1989) (allowing random drug testing of certain treasury employees involved in drug interdiction). *But see Chandler v. Miller*, 520 *U.S.* 305, 319, 117 *S.Ct.* 1295, 1303, 137 *L.Ed.*2d 513, 526 (1997)(finding unconstitutional Georgia's policy requiring candidates for public office to submit to drug testing because, to demonstrate special need, government must show "concrete danger demanding departure from the Fourth Amendment's main rule"). In *Chandler, supra*, the Court held that absent an adequate explanation for the need to target the specified category of person for the non-individualized, suspicionless drug testing, a generalized statement of salutary motive for the search was held insufficient to overcome the constitutional protection against such governmental action. 520 *U.S.* at 319, 117 *S.Ct.* at 1303, 137 *L.Ed.*2d at 526.

In *Vernonia, supra*, 515 *U.S.* at 665, 115 *S.Ct.* at 2396, 132 *L.Ed.*2d at 582, the United States Supreme Court first upheld the use of random drug testing in a school setting. The school district's policy of requiring the random drug testing of student athletes was implemented after district officials noticed a sharp increase in drug use among students in general and student athletes in particular. *Id.* at 648, 115 *S.Ct.* at 2388, 132 *L.Ed.*2d at 571. The high school football and wrestling coach attributed at least one severe injury, as well as omissions of safety procedures among athletes, to the effects of drug use. *Id.* at 649, 115 *S.Ct.* at

2389, 132 *L.Ed.*2d at 572. The increase in drug use by student athletes was described as having reached "epidemic proportions" and, so, the school district resorted to random drug testing of all interscholastic athletes. *Ibid.* Suspicion-based testing was deemed inadequate to address the school district's problems: The danger_ to students participating in the sports activities while under the influence of drugs and the role-model effect at work in the school district rendered the school officials unable to exercise appropriate control and order necessary for an educational environment. *Ibid.*

In reviewing the drug-testing policy, the Court stated that special needs that make the warrant and probable cause require-ment impracticable can exist in the public school context, where requiring a warrant "would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] need-ed" and "would undercut 'the substantial need of teachers and administrators for freedom to maintain order in the schools.' " *Id.* at 653, 115 *S.Ct.* at 2391, 132 *L.Ed.*2d at 574 (alteration in original) (citing *New Jersey v. T.L.O., supra,* 469 *U.S.* at 340–41, 105 *S.Ct.* at 742, 83 *L.Ed.*2d at 741–42). The Court noted that "while children do not 'shed their constitutional rights at the schoolhouse gate . . .' the nature of those rights is what is appropriate for children in school." *Id.* at 655–56, 115 *S.Ct.* at 2392, 132 *L.Ed.*2d at 576.

The Court observed that children in school are subject to close supervisory conditions and therefore generally enjoy a lesser expectation of privacy than adult members of the general popula-tion, and that privacy expectations were "even less with regard to student athletes." *Id.* at 657, 115 *S.Ct.* at 2392–93, 132 *L.Ed.*2d at 577 (noting communal changing and showering involved in school sports participation). In respect of the intrusion associated with the method of sample collection being utilized, the Court found privacy interests to be compromised only to a "negligible" degree because the conditions were "nearly identical" to those one would encounter in a public restroom. *Id.* at 658, 115 *S.Ct.* at 2393, 132 *L.Ed.*2d at 577. Although it was clear that the testing of bodily

fluids constituted a "search" for purposes of the Fourth Amendment, in terms of the search's intrusion upon privacy interests, the Court viewed as significant that the test detected only drugs; no other information about the subject's body was revealed by the testing and the test results were disclosed to few individuals. *Id.* at 658, 115 *S.Ct.* at 2393, 132 *L.Ed.*2d at 577–78.

Regarding the governmental-interest question, the Court stated that curbing drug use by children is important and found the rampant epidemic-like use of drugs in *Vernonia*, particularly by athletes, created a crisis because sports team members faced special health risks and, within the school community, they "were the leaders of the drug culture." *Id.* at 649, 663, 115 *S.Ct.* at 2388–89, 2395–96, 132 *L.Ed.*2d at 571, 580. The Court concluded, on balance, that the policy of random testing of the student athletes was an effective means of curbing the drug problem in the Vernonia school district that was "largely fueled" by the "role model" effect of athletes' drug use, and that was "of particular danger to athletes." *Id.* at 663, 115 *S.Ct.* at 2395–96, 132 *L.Ed.*2d at 581. Thus, a six-member majority of the Court upheld the school district's policy of drug testing school athletes upon a balancing of the interests because the majority determined that 1) students, and in particular student athletes, had a decreased expectation of privacy, 2) the search was relatively unobtrusive, and 3) the need for the random testing of the circumscribed class of student athletes was demonstrated to be immediate and severe. *Id.* at 664–65, 115 *S.Ct.* at 2396, 132 *L.Ed.*2d at 581–82.

The dissent written by Justice O'Connor (joined by Justices Stevens and Souter) chastised the majority for "treat[ing] a suspicion-based regime as if it were just any run-of-the-mill, less intrusive alternative—that is, an alternative that officials may bypass if the lesser intrusion, in their reasonable estimation, is outweighed by policy concerns unrelated to practicability." *Id.* at 676, 115 *S.Ct.* at 2402, 132 *L.Ed.*2d at 589 (O'Connor, J., dissenting). The dissent viewed the case as addressing the question whether the Fourth Amendment is "*so* lenient that students may

be deprived of [its] only remaining, and most basic, categorical protection: its strong preference for an individualized suspicion requirement, with its accompanying antipathy toward personally intrusive, blanket searches of mostly innocent people," and said that the answer "must plainly be no." *Id.* at 681, 115 *S.Ct.* at 2404, 132 *L.Ed.*2d at 592 (O'Connor, J., dissenting). The dissent also detailed inadequacies it perceived in the record, and additionally concluded that the particular policy of suspicionless testing swept too broadly and too imprecisely. *Id.* at 684–86, 115 *S.Ct.* at 2406–07, 132 *L.Ed.*2d at 594–95 (O'Connor, J., dissenting).

## B.

One could not have predicted from the holding in *Vernonia* the United States Supreme Court's expansion of the special-needs "exception" to Fourth Amendment protections. The new liberality with which "special needs" would be found in a school setting manifested itself in *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls*, 536 *U.S.* 822, 122 *S.Ct.* 2559, 153 *L.Ed.*2d 735 (2002). In a five-to-four opinion, the Court upheld random drug testing of all students involved in school extracurricular activities without any demonstration by the school district of a severe or pervasive drug problem among the students to be tested and without any specific concern about a safety risk caused by particularized drug use. *Ibid.* The school district's policy simply conditioned participation in school-sponsored extracurricular activities on a student's consent to submit to random drug testing based on a generalized desire to deter drug use by young people. *Id.* at 826, 122 *S.Ct.* at 2562, 153 *L.Ed.*2d at 741–42.

Despite the *Earls* majority's assertion that the Court's earlier holding in *Vernonia* "did not simply authorize all school drug testing, but rather conducted a fact-specific balancing of the intrusion on the child's Fourth Amendment rights against the promotion of legitimate government interests," *id.* at 830, 122 *S.Ct.* at 2565, 153 *L.Ed.*2d at 744, notably absent from the remainder of

the Court's discussion was any justification for employing, in the first instance, a balancing of interests for this category of student population. The majority did not explain why suspicion-based testing of the targeted students (those involved in extracurricular activities) was inadequate to meet government's substantial need, thereby warranting resort to special-needs balancing, as was the case with the student athletes in *Vernonia.* See *T.L.O., supra,* 469 *U.S.* at 351, 105 *S.Ct.* at 748, 83 *L.Ed.*2d at 740 (Blackmun, J., concurring).

Also, in its application of a "fact-sensitive" analysis to the drug testing in dispute in *Earls,* the majority stated that the reduced expectation of privacy among the student athletes was not "essential" to its determination in *Vernonia* that students generally have a reduced overall expectation of privacy. *Earls, supra,* 536 *U.S.* at 831, 122 *S.Ct.* at 2565, 153 *L.Ed.*2d at 745. The reduced student privacy expectations ascertained in *Vernonia* were described as instead depending "primarily upon the school's custodial responsibility and authority." *Ibid.* Nonetheless, the majority added that students who participate in extracurricular activities "voluntarily subject themselves to many of the same intrusions on their privacy as do athletes." *Ibid.*

The diminished respect given to students' privacy markedly contrasts with the Court's heightened deference to the assertion of government need. In addressing the "immediacy" of the government's concerns, the Court accepted the school district's generalized assertion that "the nationwide drug epidemic makes the war against drugs a pressing concern in every school." *Id.* at 834, 122 *S.Ct.* at 2567, 153 *L.Ed.*2d at 747. The Court eschewed any requirement that a particularized degree of drug problem be demonstrated in the schools notwithstanding that seven years earlier the Court relied on such findings in its decision in *Vernonia. Id.* at 835, 122 *S.Ct.* at 2568, 153 *L.Ed.*2d at 748. The *Earls* Court perceived the drug problem among students to have "only grown worse" since its decision in *Vernonia,* and accordingly refused to "fashion what would in effect be a constitutional quan-

tum of drug use necessary to show a 'drug problem.' " *Id.* at 836, 122 *S.Ct.* at 2575, 153 *L.Ed.*2d at 747. Although the Court recognized that "in *Vernonia* there might have been a closer fit between the testing of student athletes and the trial court's finding that the drug problem was 'fueled by the role model effect of athletes' drug use,' " it concluded that the drug testing of students who participate in extracurricular activities "effectively serves the School District's interest in protecting the safety and health of its students." *Id.* at 837–38, 122 *S.Ct.* at 2569, 153 *L.Ed.*2d at 749.

In her dissent, Justice Ginsburg, joined by Justices O'Connor, Stevens, and Souter, objected to the majority's revisionist characterization of *Vernonia:* "*Vernonia* cannot be read to endorse invasive and suspicionless drug testing of all students upon any evidence of drug use, solely because drugs jeopardize the life and health of those who use them." *Id.* at 844, 122 *S.Ct.* at 2572, 153 *L.Ed.*2d at 754 (Ginsburg, J., dissenting). Rather, the dissent viewed the particularized problem of student athletes' drug use in *Vernonia* as "essential to the *Vernonia* judgment," noting that the Court "ha[s] since confirmed that [the] special risks [involved in student athletes' drug use] were necessary to [the] decision in *Vernonia.*" *Id.* at 851, 122 *S.Ct.* at 2576, 153 *L.Ed.*2d at 758 (Ginsburg, J., dissenting) (citing *Chandler, supra,* 520 *U.S.* at 317, 117 *S.Ct.* at 1302, 137 *L.Ed.*2d at 525; *Ferguson v. Charleston,* 532 *U.S.* 67, 87, 121 *S.Ct.* 1281, 1293, 149 *L.Ed.*2d 205, 222 (2001) (Kennedy, J., concurring)). According to the dissenting members, "[the *Earls* ] case resembles *Vernonia* only in that the School Districts in both cases conditioned engagement in activities outside the obligatory curriculum on random subjection to urinalysis" and concluded, contrary to the majority's effort to fit *Earls* within *Vernonia,* that "a program so sweeping is not sheltered by *Vernonia;* its unreasonable reach renders it impermissible under the Fourth Amendment." *Id.* at 853–54, 122 *S.Ct.* at 2577, 153 *L.Ed.*2d at 759–60 (Ginsburg, J., dissenting).

C.

The majority's analysis in *Earls* now readily permits a "reasonableness" or balancing test. Unlike *Vernonia*, the record developed in *Earls* was devoid of any allegation of a "crisis" or "epidemic" of drug use either occurring among the students targeted for testing, or fueled by them, rendering suspicion-based testing inadequate to stem an identified problem caused by the students to be tested. The majority in *Earls* was content to base its conclusion of "government need" on a generalized reference to evidence of a "nationwide" drug epidemic, relying on that to justify random drug testing of a student subset that had no demonstrated connection to drug use. Plainly, the Court was satisfied to forego the requirement of a demonstrated need to target a particular group of students for random drug testing.

Moreover, to the extent that safety concerns had been vital to the determination that a special need existed permitting a departure from traditional Fourth Amendment protections and allowing mass suspicionless drug testing, the Court abandoned that as well. *Compare Von Raab, supra,* 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685, and *Skinner, supra,* 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639, *with Chandler, supra,* 520 *U.S.* 305, 117 *S.Ct.* 1295, 137 *L.Ed.*2d 513. The *Earls* Court disavowed that its holding in *Vernonia* ever hinged on the conclusion that when a student athlete participates in sports while impaired by drugs or alcohol, a danger arises for the student athlete, as well as for his or her comrades in competition.

Despite those protestations, scholars recognize that *Earls* is a change from *Vernonia. See, e.g., Supreme Court Expands Random Drug Testing: Does the Fourth Amendment Still Protect Students?,* 170 *Ed. Law Rep.* 15, 25 (2002) (noting that evolution in jurisprudence demonstrates "a clear shift" that gives "less weight to the student's privacy interests and much greater weight to the school's health and safety concerns"); Comment, *Random Suspicionless Drug Testing: Are Students No Longer Afforded Fourth Amendment Protections?,* 19 *N.Y.L. Sch. J. Hum. Rts.* 451, 479

(stating that "the Court's deviation from the warrant requirement ... has provided school districts with a malleable solution devoid of individualized suspicion and a requirement that a substantial drug problem be present before subjecting students to tests"); Note, *"Testing" Students Beyond the Academic Curriculum: Public Schools, the Fourth Amendment, and the Supreme Court,* 11 *Widener J. Pub.L.* 551, 590 (2002) (stating that "armed with *Earls,* school districts certainly have the autonomy to push the constitutional envelope and further experiment with the rights of public school students").

### III.

Between *Vernonia* and *Earls* we embraced a special-needs test in *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 *N.J.* 531, 701 *A.*2d 1243 (1997). There we applied a special-needs standard to a program of random drug testing of New Jersey Transit (NJT) police officers. 151 *N.J.* at 558, 701 *A.*2d 1243. Mindful that, under the New Jersey Constitution, exceptions to the warrant requirement are "more limited" than under the federal constitution, we nonetheless concluded that the special-needs test provided a "useful analytical framework." *Id.* at 556–57, 701 *A.*2d 1243. The fact-specific inquiry of the special-needs test compels a court to assess first, in context, "the practicality of the warrant and probable-cause requirement." *Id.* at 548, 701 *A.*2d 1243 (citation omitted).[3] The test then "enables a court to take into account the complex factors relevant in each

---

[3] In a companion case applying the special-needs test in the context of human immunodeficiency virus (HIV) testing for those convicted or charged with sexual assault, we similarly required a threshold showing that probable cause or individualized suspicion would be impractical. *State ex rel. J.G., N.S. and J.T.,* 151 *N.J.* 565, 578, 701 *A.*2d 1260 (1997). We found that requirement satisfied because those with HIV often do not have any manifestations of the disease. *Id.* at 579, 701 *A.*2d 1260. Thus, where the results of the test would have no criminal consequences, and the State had a compelling interest in the physical and mental well-being of the sexual-assault victim, we upheld the statute that authorizes such searches. *Id.* at 594, 701 *A.*2d 1260.

case and to balance those factors in such a manner as to ensure that that right against unreasonable searches and seizures is adequately protected." *Id.* at 556, 701 A.2d 1243 (citation omitted).

In applying that analysis to the NJT drug-testing policy, we first observed that the nature of the police officers' patrol duties rendered impractical detection of drug use by observation. *Id.* at 558, 701 A.2d 1243. A requirement of individualized suspicion of drug use would compromise NJT's legitimate safety concerns in that drug impaired officers could "cause great human loss before any signs of impairment become noticeable to supervisors or others." *Id.* at 559, 701 A.2d 1243 (citing *Skinner, supra,* 489 *U.S.* at 628, 109 *S.Ct.* at 1419, 103 *L.Ed.*2d at 667). Convinced that individualized suspicion of drug use was an imperfect approach to the problem, we turned then to the balancing of relevant factors.

We found the NJT program to be tailored narrowly in that it applied only to employees who performed functions affecting public safety. *Ibid.* Although we recognized that urine testing is an intrusion on privacy during both collection and testing, even if "collected in a manner that ensures the modesty and privacy" of employees, we determined that transit officers have a diminished expectation of privacy due to their "law enforcement status." *Id.* at 560–61, 701 A.2d 1243. Moreover, we determined that the threat to public safety from officers acting under the influence of drugs was "manifest." *Id.* at 562, 701 A.2d 1243. They are permitted to carry firearms, and to "exercise the most awesome and dangerous power that a democratic state possesses ... the power to use lawful force to arrest and detain." *Id.* at 561, 701 A.2d 1243 (citation omitted). That is, "at any time ... [transit officers] may be called upon to exercise discretion in the use of a weapon. At that moment, the officer's judgment is critical." *Id.* at 562, 701 A.2d 1243. The duties of armed transit officers were viewed as "fraught with such risk of injury to others that even a momentary lapse of attention can have disastrous consequences." *Id.* at 562–63, 701 A.2d 1243 (quoting *Von Raab, supra,* 489 *U.S.*

at 670, 109 *S.Ct.* at 1393, 103 *L.Ed.*2d at 705). And finally, we were persuaded from the record that drug use was a problem among the ranks of NJT's police officers. *Id.* at 563, 701 *A.*2d 1243. Thus, considering the "safety-sensitive" nature of the officers' duties, along with the difficulty in detecting individualized drug use among a mobile force not subject to day-to-day scrutiny, we concluded that special needs existed to justify suspicionless drug testing of this particular category of NJT employee. *Ibid.*

The question for us is whether, having adopted in *N.J. Transit* the special-needs test as it was understood and applied in *Vernonia*, we are willing to change horses in midstream and adopt the lesser *Earls* standard as satisfying our own state constitutional requirements for searches.

## IV.

### A.

Our Court has not shied away from affording citizens of this State greater protection under the New Jersey Constitution than that divined by federal interpretation of the United States Constitution. See Gerald Rusello, *The New Jersey Supreme Court: New Directions?*, 16 *St. John's J. Legal Comment.* 655, 656 (2002); Marie Garibaldi, *The Rehnquist Court and State Constitutional Law*, 34 *Tulsa L.J.* 67, 74 (1998); Mary Cornelia Porter & G. Alan Tarr, *The New Judicial Federalism and the Ohio Supreme Court: Anatomy of a Failure*, 45 *Ohio St. L.J.* 143, 157 (1984); William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 *Harv. L.Rev.* 489, 499 (1977).

As we have explained,

[i]n interpreting the New Jersey Constitution, we look for direction to the United States Supreme Court, whose opinions can provide valuable sources of wisdom for us. . . . but although that Court may be a polestar that guides as we navigate the New Jersey Constitution, we bear ultimate responsibility for the safe passage of our ship. Our eyes must not be so fixed on that star that we risk the welfare of our passengers on the shoals of constitutional doctrine.

[*State v. Hempele*, 120 *N.J.* 182, 196, 576 *A.*2d 793 (1990) (citation omitted).]

In determining whether to part company from the Supreme Court on interpretations of federal constitutional requirements when we interpret cognate provisions of our own Constitution, we have employed a "criteria" approach. *State v. Williams,* 93 *N.J.* 39, 57, 459 *A.*2d 641 (1983). That approach, first announced by Justice Handler in *State v. Hunt,* analyzes numerous factors, including (and most significant for this case) matters of particular state interest or local concern, state traditions, and public attitudes, to determine whether a particular situation calls for greater protections under the state constitution. 91 *N.J.* 338, 364–67, 450 *A.*2d 952 (Handler, J., concurring). Where particular questions are "local in character" and do not appear to require a "uniform national policy," they may be suited for independent action based on state constitutional law. *Id.* at 367, 450 *A.*2d 952. The State's history and traditions also weigh heavily in the determination. *Ibid.*

## B.

Consistent with those principles, we have been willing to afford some greater protection under the State Constitution in the areas of search and seizure and individual privacy. *Hempele, supra,* 120 *N.J.* at 197, 576 *A.*2d 793; *see also Right to Choose v. Byrne,* 91 *N.J.* 287, 300, 450 *A.*2d 925 (1982) (observing that "the United States Supreme Court itself has long proclaimed that state Constitutions may provide more expansive protection of individual liberties than the United States Constitution") (citations omitted). Accordingly, on numerous occasions we have declined to follow the approach of the Supreme Court on search and seizure standards. *See, e.g., State v. Cooke,* 163 *N.J.* 657, 670, 751 *A.*2d 92 (2000) (concluding New Jersey Constitution requires existence of exigent circumstances for application of automobile exception to warrant requirement, notwithstanding Supreme Court decision to contrary); *State v. Pierce,* 136 *N.J.* 184, 213, 642 *A.*2d 947 (1994) (holding that vehicular search incident to traffic offense is unreasonable under State Constitution); *Hempele, supra,* 120 *N.J.* at

195, 576 *A.*2d 793 (holding that citizens of New Jersey have privacy interest in curbside garbage); *State v. Novembrino,* 105 *N.J.* 95, 154, 519 *A.*2d 820 (1987) (declining to recognize good-faith exception to exclusionary rule in New Jersey); *Hunt, supra,* 91 *N.J.* at 344–47, 450 *A.*2d 952 (holding that State Constitution protects privacy interest in telephone billing records); *State v. Johnson,* 68 *N.J.* 349, 353, 346 *A.*2d 66 (1975) (affording greater protections in context of consent to search).

*State v. Cooke, supra,* exemplifies our disinclination to follow in lockstep the evolution of United States Supreme Court precedent that has loosened requirements concerning the reasonableness of searches. 163 *N.J.* at 670, 751 *A.*2d 92. At the time of our decision in *Cooke,* several recent United States Supreme Court cases had "essentially disposed of" the additional requirement of exigent circumstances in the context of automobile searches. 163 *N.J.* at 666, 751 *A.*2d 92 (citing *Pennsylvania v. Labron,* 518 *U.S.* 938, 116 *S.Ct.* 2485, 135 *L.Ed.*2d 1031 (1996)). Perceiving those cases as rendering "virtually all warrantless searches of vehicles ... valid under the automobile exception as long as the search is supported by probable cause," we refused to modify our jurisprudence to follow federal precedent. *Id.* at 666, 670, 751 *A.*2d 92.

Here, where the school board's policy is challenged under Article I, paragraph 1, in addition to Article I, paragraph 7, we are informed by our prior holdings under our State Constitution that provide greater individual privacy protections than under the federal constitution. See *Planned Parenthood of Cent. N.J. v. Farmer,* 165 *N.J.* 609, 629, 762 *A.*2d 620 (2000) (recognizing that "in New Jersey, we have a long-standing history ... demonstrating a commitment to the protection of individual rights under the State Constitution"). Accordingly, "governmental intrusion into privacy rights may require a more persuasive showing of a public interest under our State Constitution than under the federal Constitution." *In re Grady,* 85 *N.J.* 235, 249–50, 426 *A.*2d 467 (1981) (holding "right to be sterilized comes within privacy rights protected from undue governmental influence by our State Consti-

tution"); *see also State v. Saunders,* 75 *N.J.* 200, 220, 381 *A.*2d 333 (1977) (Schreiber, J., concurring) (fornication statute violates right of privacy under State Constitution).

## V.

The starting point in the analysis under Article I, paragraph 7 is that suspicionless searches, such as that involved in random drug testing, are prohibited and must be justified by a special need. Only when that special need is established may one proceed to balance the nature of the intrusion on privacy against the severity of the demonstrated government need. By adhering to that requirement we prevent the special-needs exception from swallowing the rule, as Justice Blackmun cautioned in *T.L.O., supra.* That served as our premise in *N.J. Transit, supra.* 151 *N.J.* at 544, 701 *A.*2d 1243 (stating that only "in certain limited circumstances" have warrantless searches, conducted without individualized suspicion or probable cause, been upheld). And, that special showing was required and satisfied in both *Vernonia* and *N.J. Transit.* In each, suspicion-based methods were insufficient to detect and stop drug use in the circumscribed populations impacted by the testing program. The use of drugs by members of the targeted populations posed a danger to them, as well as to other innocent individuals interacting with them. Drug use among the population of persons targeted for the random drug testing also was demonstrated clearly. The random program of routine testing that was devised in each case was tailored narrowly to the specific problem population only and it was necessary for safety's sake, other methods of preventing drug use having proven inadequate.

The record here is unlike those in *Vernonia* and *N.J. Transit* in each of those respects. It fails on every level. No special showing has been made to justify the right to employ a balancing-of-interests test in lieu of typical Article I, paragraph 7 protections for the classification of students targeted for suspicionless testing. The majority's apparent satisfaction with the level of proof on that

threshold point effectively eliminates the first step of the analysis for the population of students affected. We should not even get to the balancing-of-interests step in the analysis, but if we did, the record fails that test as well.

A.

First, nowhere in this record is there justification for singling out these students for required drug testing. There is no doubt that we would not countenance mass drug testing, without any demonstration of cause, of individuals found to loiter on street corners in known drug-infested neighborhoods. Public school students, unconnected with drug use or its promotion in any way, should enjoy no less protection from random bodily searches. Students' privacy interests are not ephemeral. Here, those interests are being cast aside without any justification for the targeting of this subset of students.

The surveys conducted do not demonstrate a drug problem among the extracurricular-program-involved students to be tested. Even the majority recognizes that "the RMBSI survey results do not distinguish between those who engage in extracurricular activities and those who do not." *Ante* at 612, 826 *A*.2d at 651. And, no attempt has been made to show that suspicion-based methods are inadequate to further the district's desire to curtail student drug use. The general statistics cited are not persuasive on either topic. There simply is no crisis or problem of "epidemic" proportion within the targeted population, or fueled by it. The statistics reflect some drug usage by students generally, but they also suggest that usage may, indeed, be lessening. Fundamentally, the statistics fail to demonstrate any nexus tying the group of students targeted for mass testing to the reason for the school board's testing program.

One cannot but conclude that the program is not narrowly tailored. Any protestation about that point based on a generalized assertion of the need to use random drug testing as a means of deterrence is further belied by the current most comprehensive

study of the effect of drug testing performed by a grant from the National Institute on Drug Abuse and the Robert Wood Johnson Foundation, recently published in the Journal of School Health, April 2003, Vol. 73, No. 4, 159–64. That study demonstrates, contrary to the assumption of proponents of drug testing, a lack of deterrent effect from testing regimens implemented in school districts throughout the county. The study, the largest of its kind, encompassed 75,000 students. Its conclusions are not undermined by any competent proof in this record. In any event, invocation of a desire to deter drug use, albeit a salutary purpose, does not insulate government officials from compliance with attendant Article I, paragraph 7 protections. *Cf. State v. Johnson*, 168 *N.J.* 608, 775 *A.*2d 1273 (2001)(holding that mere reference to preventing evidence destruction in drug trafficking investigation is insufficient justification for trial court's issuance of no-knock warrant to search home).

Here, there is no basis for finding special need to engage in a balancing of interests concerning the right of students in extracurricular activities to be free of the presumptively unreasonable search entailed by random drug testing. The majority avoids this failing in the *Earls* analysis by attempting to find an analogy here to administrative searches. The analogy is a poor one. Administrative searches of pervasively regulated industries have been permitted without individualized suspicion because of the intensive government involvement that is a condition of the permitted activity. *See, e.g., In re Martin*, 90 *N.J.* 295, 313–14, 447 *A.*2d 1290 (1982) (finding that casino employees have limited expectation of privacy based on pervasive agency regulation of industry); *State v. Turcotte*, 239 *N.J.Super.* 285, 290, 571 *A.*2d 305 (App.Div. 1990) (noting that horse racing is pervasively regulated industry). Warrantless searches conducted under that exception are permitted if three criteria are satisfied:

First there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made....

Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." ...

[And f]inally, "the statute's inspection program, in terms of the certainty and regularity of its application [must] provid[e] a constitutionally adequate substitute for a warrant."

[*N.J. Transit, supra,* 151 *N.J.* at 546, 701 *A.*2d 1243 (alterations in original) (quoting *New York v. Burger,* 482 *U.S.* 691, 702–03, 107 *S.Ct.* 2636, 2644, 96 *L.Ed.*2d 601, 614 (1987)).]

Students in school do not fall within the category of a pervasively regulated industry. Children must go to school through age sixteen. *N.J.S.A.* 18A:38–25 and –27. The State has a constitutional obligation to provide a thorough and efficient system of public school education. *N.J. Const.* art. VIII, § 4, ¶ 1. That setting, specifically the relationship between government and public school pupil, does not equate with an individual or entity being authorized to engage in an activity that the State permits to be performed, subject to the State's careful and intensive regulatory control as a condition of the privilege.

In sum, the mere incantation that students do not enjoy the full constitutional protections of adults while under the control of school officials does not support the right to engage in a balancing of interests concerning the integrity of their bodily fluids. The *Vernonia* analysis that served as the backdrop to *N.J. Transit* required much more. In *Vernonia,* the school setting itself did not justify the random drug testing of the student athletes. The school administrators' tutelary and custodial responsibility for school children generally did not support the collection and testing of the student athletes' urine. Safety concerns and a telescoped suspicion of drug usage by athletes, as well as the athletes' encouragement of others' drug use by way of role model example, fueled the determination to allow the limited random testing. None of those reasons is present here. In my view, the record here is woefully inadequate to demonstrate a basis for engaging in a balancing of interests as to the constitutional right of this broad class of students (those involved in extracurricular activities or permitted to park on campus) to be free of the unreasonable search of random, routine drug testing.

B.

The record fails on a second level as well. Even if a balancing were to be performed, the school district has not carried its burden. The government need to perform this broad-based testing program is not compelling on this record. There is, as noted, no overwhelming problem in this school, or among this subset of students. Nor is the program of random drug testing supported by any legislative policy encouraging this wide-reaching routine testing. *See, e.g., N.J.S.A.* 18A:40A–12 (authorizing suspicion-based drug intervention programs in schools). Moreover, the recent study reported in the Journal of School Health indicates that school-based drug-testing programs have not proven their anticipated deterrent effect.

Against the weak interest in testing this particular subset of students one must weigh the privacy interests of the individuals. Students' privacy expectations in their bodily fluids have never been violated like this before. The manner of the collection of the bodily fluids may not be in issue, but the collection and testing of the excretory fluids are still intrusions on privacy that must be justified in order to require the members of the group targeted to submit to testing. No reason has been given.

Indeed, picking the group that has been selected is perverse, one could say counterproductive.[4] *Earls, supra,* 536 *U.S.* at 852–53, 122 *S.Ct.* at 2577, 153 *L.Ed.*2d at 759 (Ginsburg, J., dissenting) (citing study showing that students who participate in extracurricular activities are less likely to develop substance abuse problems). This program, like the one in *Earls,* is subject to the legitimate

---

[4] Although the intent of the school board may be beneficent, it is entirely possible that the drug-testing program actually will achieve the opposite of the desired effect. *See, e.g., ACLU Fact Sheet # 2: Social Science Research on Adolescent Drug Use and School Involvement, available at* http://archive.aclu.org/library/earlsfact2.html (cataloging various authorities that have found that suspicionless, random drug testing in high school students might actually increase prevalence of drug use).

criticism that it risks driving away from school activities the very pupils who may be most susceptible to a drug culture.

Realistically, the school district picked this group for no other reason than to be able to claim that there is an element of consent to the search. The school district contends that students voluntarily submit to the testing as a condition of choosing to participate in extracurricular activities. In my view, the balancing does not tilt in government's favor based on its unrealistic view of the "consent" involved when a student's entitlement to participate in extracurricular activities is at stake.

In stating as much, I do not suggest, nor do the parties appear to assert, that students have an absolute right to participate in school extracurricular activities. *See, e.g., Albach v. Odle,* 531 *F.*2d 983, 984–85 (10th Cir.1976) (stating that "[p]articipation in interscholastic athletics is not a constitutionally protected civil right"); *Mitchell v. La. High Sch. Athletic Ass'n,* 430 *F.*2d 1155, 1158 (5th Cir.1970) (observing that "[t]he privilege of participating in interscholastic athletics must be deemed to fall . . . outside the protection of due process"). Rather, plaintiffs rest their argument in this respect on *Perry v. Sindermann,* 408 *U.S.* 593, 597, 92 *S.Ct.* 2694, 2697, 33 *L.Ed.*2d 570, 577 (1972), where the Court wrote:

[E]ven though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . for if the government could deny a benefit to a person because of his [exercise of] constitutionally protected [rights], his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

[ (citation omitted).]

*See also Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr,* 518 *U.S.* 668, 674, 116 *S.Ct.* 2342, 2347, 135 *L.Ed.*2d 843, 851 (1996) (stating that "our modern 'unconstitutional conditions' doctrine holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit")

(citation omitted); *Sherbert v. Verner,* 374 *U.S.* 398, 404, 83 *S.Ct.* 1790, 1794, 10 *L.Ed.*2d 965, 971 (1963) (commenting that "it is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege"); *Right to Choose, supra,* 91 *N.J.* at 287, 450 *A.*2d 925 (holding that prohibiting use of state Medicaid funds to pay for abortion services "can be understood only as an attempt to achieve with carrots what government is forbidden to achieve with sticks") (citation omitted).

Plaintiffs argue that the government is forbidden from making the receipt of a benefit or privilege (in this case, participation in extracurricular activities) contingent on the infringement of a constitutionally protected right (freedom from unreasonable searches and seizures). Defendants, in turn, counter that the high school students waive their right to be free from unreasonable searches and seizures by "voluntarily" participating in activities that are no more than a "privilege." Plaintiffs clearly have the better of the argument: The school district cannot require "voluntary" waiver of the right to be free from searches any more than the county commissioners of Wabaunsee County, Kansas could require municipal contractors to "voluntarily" waive their First Amendment right to criticize the local government in order to receive government contracts. See *Umbehr, supra,* 518 *U.S.* at 674, 116 *S.Ct.* at 2347, 135 *L.Ed.*2d at 851. *Cf. Marchwinski v. Howard,* 113 *F.Supp.*2d 1134, 1140 (E.D.Mich.2000), *aff'd by an equally divided court,* No. 00–2115, 2003 WL 1870916 (6th Cir. April 7, 2003) (striking down Michigan statute conditioning welfare benefits on drug testing). The contention is tantamount to conditioning receipt of a valuable government benefit on waiver of a constitutional right, an argument repeatedly rejected by the Supreme Court. See, *e.g., Sindermann, supra,* 408 *U.S.* at 597, 92 *S.Ct.* at 2697, 33 *L.Ed.*2d at 577. In short, although the government may have no particular constitutional responsibility to provide a particular benefit, if it chooses to do so it cannot condition receipt of the benefit in a way that requires recipients to forego constitutional rights.

Furthermore, in today's society, it is not at all clear that participation in high school extracurricular activities is altogether voluntary—at least for those students who wish to attend four-year colleges and universities. As Justice Ginsburg explained in her dissent in *Earls,* extracurricular activities are "essential in reality for students applying to college.... Students 'volunteer' for extracurricular pursuits in the same way they might volunteer for honors classes: They subject themselves to additional requirements, but they do so in order to take full advantage of the education offered them." *Earls,* 536 *U.S.* at 845–46, 122 *S.Ct.* at 2573, 153 *L.Ed.*2d at 754 (citation omitted) (Ginsburg, J., dissenting).

It also is far from clear that high schools that provide extracurricular activities are acting altruistically by providing the students a voluntary "benefit." The better argument, as recognized by the dissenting members in *Earls,* and others, seems to be that such activities have become an essential component of education in American public high schools. Twenty years ago, President Reagan recognized the "significant place extracurricular opportunities have in the growth of [the Nation's] high school students," and the fact that those opportunities "help students to learn to set and achieve goals, to organize their time effectively, and to enhance the social skills that are needed to enjoy and succeed in life." Pres. Proc. No. 5109, 48 *Fed.Reg.* 44,749 (Sept. 27, 1983).

With a majority of high school students participating in some form of extracurricular activity, high school students who wish to protect their right to be free from unreasonable searches should not be forced to ostracize themselves from their peers by foregoing participation in any school-sponsored activity. See American Academy of Pediatrics, *Testing for Drugs of Abuse in Children and Adolescents, available at* http://www.aap.org/policy/01495.html (observing that "such programs may not be truly voluntary as there are often negative consequences for those who choose not to take part"). Plaintiffs here concede that student participation in extracurricular activities can be conditioned, for example, on a

G.P.A. requirement, or adherence to a school code of conduct, or any number of factors that bear on a school district's responsibility to provide a safe and orderly educational environment. However, the assertion of the right and authority to maintain a safe and orderly environment does not mean that students who participate must submit to random drug testing in order for that goal to be achieved, absent any showing of particularized drug use connected to the students involved in the extracurricular activities (or, as here, students who bring cars and park them on school property). That is, as Justice Ginsburg explained,

[i]n regulating an athletic program or endeavoring to combat an exploding drug epidemic, a school's custodial obligations may permit searches that would otherwise unacceptably abridge students' rights. When custodial duties are not ascendant, however, schools' tutelary obligations to their students require them to "teach by example" by avoiding symbolic measures that diminish constitutional protections. "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

[*Earls, supra,* 536 *U.S.* at 854, 122 *S.Ct.* at 2578, 153 *L.Ed.*2d at 760 (alteration in original) (Ginsburg, J., dissenting) (citing *West Virginia Bd. of Ed. v. Barnette,* 319 *U.S.* 624, 637, 63 *S.Ct.* 1178, 1185, 87 *L.Ed.* 1628, 1637 (1943)).]

## VI.

What is particularly mystifying to me is the majority's determination to provide less protection against unreasonable searches to a category of suspicionless school children, when it has not hesitated to provide enhanced protections under our State Constitution to suspects in criminal prosecutions. The majority's determination affords lesser personal protection from unreasonable searches to innocent public school students than to committed mental patients suspected of harboring drugs within their rooms in a State-run institution, *State v. Stott,* 171 *N.J.* 343, 794 *A.*2d 120 (2002), or to out-of-control intoxicated individuals transported to hospital emergency rooms from accident scenes by police officers, *State v. Ravotto,* 169 *N.J.* 227, 777 *A.*2d 301 (2001). Although those cases implicated potential criminal charges, the lack of a potential criminal consequence does not permit unfettered access

to students' bodily fluids, absent any particularized suspicion of the students targeted. The lack of criminal prosecution in the current setting falls far short of logically supporting the analogy to an administrative search found by the majority today.

Students have privacy expectations that legitimately include freedom from the bodily searches required for drug testing. The majority's acceptance of references to national concerns about drug usage by student-age youths as sufficient to quell constitutional concerns utterly fails on analysis. The teacher and administrator anecdotes in this record reflect concerned and involved teaching staff members, but do not adequately demonstrate a problem that cannot be addressed with suspicion-based drug testing, or a program of random drug testing tailored to problem populations within the student body. The anecdotes, coupled with the unfocused survey information, fall short of demonstrating a need to test those students involved in extracurricular activities. For me, the record here is as inadequate as the *Earls* record was.

Not doubting for a second the good intentions of the school district, and that of the majority of our Court that has found room in our State Constitution for this broad program of drug testing of public school students, I nevertheless return to the notion that there are certain core values that are dear to our society and define our self-identity. Central among them are the right to freedom from unreasonable searches, to adherence to the constitutional requirement of a warrant procured from a neutral magistrate upon a showing of probable cause, and to the assurance that the warrant requirement will be dispensed with only for the most compelling reasons. In *N.J. Transit,* our Court accepted the "special-needs" analysis, as it was employed in *Vernonia.* The special-needs test applied in *N.J. Transit,* however, does not support the drug-testing program here. Our Court can only take this step by agreeing to apply the less rigorous standard for finding special need that a bare majority of the United States Supreme Court has permitted in *Earls.* It is a mistake to do so.

We have not hesitated in the past to conclude that the State Constitution affords New Jerseyans greater protection against unreasonable searches than that which is afforded under the United States Constitution. We do not lightly interpret our constitutional language differently from its federal counterpart, but this is an occasion on which our Constitution's surpassing protection should be recognized. There is no convincing practical and necessary justification, no "special need," to deprive this targeted category of persons—school children who wish to involve themselves in extracurricular activities—of their right to be free from random, routine drug testing.

## VII.

I would reverse and reinstate the judgment of the Chancery Division.

Justices LONG and ALBIN join in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO and ZAZZALI—4.

*For reversal*—Justices LONG, LaVECCHIA and ALBIN—3.